ROSEMARY COFFEY, Plaintiff-Appellant, v. JACK D. BRODSKY, Defendant-Appellee.

Fourth District   No. 4—86—0797

Opinion filed December 30, 1987.

LUND, J., concurring in part and dissenting in part.

Phebus, Tummelson, Bryan & Knox, of Urbana (Joseph W. Phebus, of counsel), for appellant.

Richard F. Record, Jr., of Craig & Craig, of Mattoon, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Plaintiff, Rosemary Coffey, filed a two-count complaint against defendant, Dr. Jack Brodsky, as a result of injuries allegedly sustained by plaintiff following an abdominal hysterectomy September 17, 1982. A jury trial was held in the circuit court of Champaign County. The court granted defendant's motion for a directed verdict at the close of

all the evidence on count I. The jury returned a verdict for defendant on count II. Plaintiff appeals, claiming the trial judge erred in directing the verdict, in denying her motion to strike the testimony of defendant's expert and in refusing to give plaintiff's instruction No. 14A. We reverse and remand for a new trial on both counts.

The facts are not disputed. Count I of the complaint invoked the theory of *res ipsa loquitur*. Plaintiff alleged that during the course, of the hysterectomy, her left ureter was enclosed by one or more sutures used to close up the peritoneum, the membrane which lines the abdominal cavity. She alleged the injury would not have occurred had defendant employed the skill and care used by a reasonably well-qualified OB-GYN specialist. She alleged the presence of the suture was the proximate cause of her injury. Defendant denied these allegations.

Count II alleged specific negligence. Paragraph four of count II alleged defendant "negligently and carelessly violated the *** duty *** [by] enclos[ing] the plaintiff's left ureter with one or more reperitonealizing sutures." On the first day of trial, plaintiff amended this paragraph to conform to discovery and anticipated proof to read:

"4. That defendant negligently and carelessly violated the aforesaid duty in that during the course of said operation he did place or cause to be placed a suture in such a position that it caused partial obstruction of the plaintiff's left ureter."

Defendant's answer to count II denied the existence of a duty, any violation, or any causation of plaintiff's injury. On the last day of trial, defendant amended his answer to read:

"4. Admits that during the course of said operation Defendant did place or cause to be placed a suture in such a position that it caused a partial obstruction of the Plaintiff's left ureter and denies the remaining allegations contained in numbered paragraph 4 of Count II of the Complaint."

Prior to the operation plaintiff had never experienced symptoms of urinary tract infection. She had no prior difficulty in retaining urine or having adequate pressure on urination. A few days before the hysterectomy, she underwent a dilation and curettage (D & C) performed by defendant.

The hysterectomy was performed September 17, 1982. Plaintiff did not recall any preoperative discussions with the defendant regarding potential complications. On September 22, 1982, plaintiff testified Dr. George B. Perlstein, a urologist, ran tests on her at defendant's request. Dr. Perlstein performed further surgery September 25, 1982, to repair the ureter. Plaintiff described her subsequent symptoms as constant urgency, inability to urinate, and a sharp, burning sensation.

Dr. Perlstein prescribed medication to stimulate bladder muscles and promote complete urination. Plaintiff noticed no improvement under this regimen. Dr. Perlstein prescribed self-catheterization in July 1983. Plaintiff was required to insert a catheter in her urethra at every urination in order to remove residual urine. Each catheterization normally resulted in about two ounces of urine, though occasionally four to five ounces were produced. Plaintiff stated at the time of trial she had developed symptoms of urinary tract infection two to three times a year since 1982.

Defendant, a board-certified obstetrician and gynecologist, testified as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, par. 110, par. 2—1102). He stated he first saw plaintiff July 21, 1982, for extraordinary vaginal bleeding. He took a history at that time. A D & C was performed at Burnham City Hospital September 11, 1982. Plaintiff was readmitted on September 15 after a recurrence of bleeding. Following a discussion of options with defendant, plaintiff chose to proceed with a hysterectomy. Defendant stated at trial the usual hospital stay in such cases was seven to nine days.

During the hysterectomy, defendant testified he found the left fallopian tube and ovary adherent to the posterior leaf of the left broad ligament. He stated this presented no difficulty. After removing plaintiff's uterus, left ovary, and left fallopian tube, he checked the ureter to see if any damage had taken place. He stroked the ureter to produce a peristaltic wave, which distinguished the ureter from blood vessels and other structures in the abdominal cavity. The uppermost and lowermost parts of the ureter were not visible. The peritoneum was closed with a continuous O chromic catgut suture, designed to dissolve in two to four weeks.

Immediately following the hysterectomy defendant described the operative procedure in a report in which he stated the left ovary and fallopian tube were adherent to the posterior surface of the left broad ligament. At trial, he testified there was no present inflammation, but stated "apparently there was an old chronic inflammation." He did not note this in his operating report.

Defendant assisted Dr. Perlstein in the September 25, 1982, operation and observed a kink in the left ureter five to six centimeters away from the bladder. He observed a bite of suture through the ureter's outermost layer, the adventitia. Defendant testified the part of the ureter with the obstruction was not the part he could observe when stroking the ureter during the hysterectomy. He noticed the ureter was much closer to the resutured area than one expected; how-

ever, he felt this was a minor variation on the normal anatomy.

Dr. George B. Perlstein, a board-certified urologist, examined plaintiff September 22, 1982, at defendant's request. Tests revealed blockage in the left ureter. Plaintiff was diagnosed as having hydronephrosis, an accumulation of urine in the left kidney. Dr. Perlstein said he assumed the condition resulted from the suture in the ureter. A nephrostomy tube was inserted in order to drain the kidney.

Dr. Perlstein testified the ureter's condition totally blocked the flow of urine for all practical purposes. On September 25, 1982, he operated to repair the ureter. He observed a stitch in the peritoneum which took in two to three inches of the ureter. The resulting kink involved an inch or less of the ureter and resembled "a partially unbent paper clip." Dr. Perlstein performed a ureteral reimplantation using a Boari flap procedure. Prior to the operation, the ureter entered the bladder at the base. Following the Boari flap procedure, the ureter entered the bladder at the top left portion.

In March 1983, plaintiff saw Dr. Perlstein, complaining of excess residual urine. Tests showed plaintiff retained more urine than normal after voiding. Dr. Perlstein prescribed medication to stimulate the bladder to empty more completely. In July 1983 he prescribed self-catheterization, plus medication to resist infection. Both the condition and the treatment were considered permanent. The doctor stated plaintiff's condition increased the risk of urinary tract infection. He testified with a reasonable degree of medical certainty the urine retention problem was "probably" related to his surgery on plaintiff, but he did not know why. Dr. Perlstein stated the September 25, 1982, surgery was made necessary by the suture in the adventitia.

Dr. Gerald Zatuchni, a board-certified professor of obstetrics and gynecology at Northwestern University, testified as plaintiff's expert. Dr. Zatuchni stated the hysterectomy records did not indicate any anatomical distortions which would make the operation more difficult than usual. Defendant did not mention in the operating report any thickening of the peritoneum or any lack of pliability, although such items should be noted in the reports if they exist. Although adhesions found at the left ovary and fallopian tube could also cause the peritoneum to thicken, no thickening was noted in defendant's operating report.

Dr. Zatuchni found nothing to indicate the hysterectomy was of a difficult nature requiring extra steps to identify the ureter. He stated within a reasonable degree of medical certainty there was no anatomical or other reason for inadvertently including a portion of the ureter in the suture. Defendant's conduct therefore fell below the minimum

standard of care. On cross-examination, Dr. Zatuchni stated defendant's only deviation from the standard of care during the hysterectomy was placing the stitch in the adventitia.

Defendant's expert was Dr. Antonio Scommengna, a board-certified obstetrician-gynecologist, chairman of the department of obstetrics and gynecology at Michael Reese Hospital in Chicago, and professor of obstetrics and gynecology at the University of Chicago. Dr. Scommengna stated, within a reasonable degree of medical certainty, defendant did not deviate from the standard of care. He referred frequently to an inflammatory process which may have thickened the peritoneum, resulting in less pliability:

> "[T]he left tube and ovary were adherent to the broad ligament, that is probably a result of an inflammatory process which, in the past, had made the ovary, which is usually—and the tube—which is usually free and not adhering to the wall to the broad ligament adherent. When this takes place in general, there is an inflammatory process. There is inflammation which fixes the ovary in the tube to the broad ligament. However, inflammation does not go toward the tube and ovary. It may go toward the inside, toward the ureter, and if it does that, it makes the tissues less pliable, less soft, less—with less give, so to speak, and with less mobility of the ureter. *** It became apparent that one of the stitches where the area of the tube and ovaries had been adhering to the peritoneal cavity, the stitches of the peritoneal cavity, the edge, included some tissue that was beneath, and because of the lack of mobility of the ureter, because the ureter may have been pulled and fixed, this was included in the stitch."

While discussing choices available to a surgeon who wishes to take special precautions to protect the ureter, Dr. Scommengna stated:

> "[I]f the adhesions had been extensive, I'm sure any gynecologist with significant—with training and expertise and experience may have wanted to isolate the ureter before putting in the stitch; however, the amount of inflammation was very modest, as described in the pathology, and therefore, this was not necessary to do and a decision was made, judgment rendered to place the stitch, also because of the lack of pliability of the tissue and the lack of mobility, the stitch was placed in such a way—the stitch resulted in such a way as to catch the very outer layer of the ureter in this circumference [sic], in this process."

When asked whether a suture placed in the adventitia always causes blockage in the ureter, the witness responded:

"No. You see, only the outer portion of the ureter covering was occluded. \*\*\* Had it been involved, completely involved, it would become apparent much sooner, so this was the consequence of the healing process, the inflammatory process that usually accompanies the removal of the suture by the body. So, if there is lack of mobility of the ureter, this lack of mobility of the ureter may pull the ureter toward where the stitch is being placed toward the peritoneal cavity, not because it wasn't free to move away from the inflammatory process and then become involved in the—by the pressure of inflammatory process and, therefore, blockage of the ureter and accumulation of the urine did take place."

On cross-examination, the doctor acknowledged defendant's operating report of September 17, 1982, did not refer to any thickening, inflammation or lack of pliability of the peritoneum. He stated inflammation was implied because adherent bodies existed, and inflammation causes adherence. Dr. Scommengna said a lack of pliability and a thickening in the peritoneum may have contributed to the occurrence:

"Q. \*\*\* If I understand, Doctor, you believe that in retrospect a lack of pliability of the peritoneum is what resulted in the—may have contributed to the stitch being placed in the ureter?

A. The lack of pliability and the thickening of the structure, the peritoneum in that area, yes.

Q. May have contributed?

A. May have contributed.

Q. And, so would it be fair to say that the cornerstone of your opinion is that you are assuming that the appearance of the patient's structures was such that the doctor, in the exercise of ordinary care, would not realize that there was an inflammation and such a lack of pliability of tissue that it was necessary to isolate the ureter?

A. No. I don't believe that the doctor didn't realize there was an inflammation. The doctor realized that there was the thickening; however, he had to make two choices as I mentioned before. The choice was either isolate the ureter, either leave the ureter, leave the—do not put the stitch through it—or include the stitch. In his best judgment, he placed the stitch sufficiently superficial as to not including [sic], in his best judgment, any other structure back from the peritoneum which

turned out not to be the case.

* * *

Q. Okay. So, it is fair to say that the cornerstone of your opinion is that you are assuming the appearance of the structures was such that the doctor exercising ordinary care would not realize there was inflammation—such inflammation and such lack of pliability that it was necessary to isolate the ureter?

A. Yes, lack of pliability implies thickening."

When questioned further on this point, he stated the reason defendant's report did not refer to lack of pliability or presence of inflammation was because the condition was not obvious. Routine matters, like stroking the ureter to produce a peristaltic wave, are not noted. Dr. Scommengna stated if there had been a "significant inflammatory process," defendant would have mentioned it in the report.

At the close of all the evidence, defendant moved for a directed verdict. The judge granted the motion as to count I. He stated *Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 415 N.E.2d 397, supported his rationale. Acknowledging strong proof of specific negligence, the judge stated to submit both counts to the jury risked the possibility the jury "speculated on something other than the specific act or omission proved" if it found liability. The court stated it was "inviting speculation" in allowing the *res ipsa loquitur* count in the face of proof of specific negligence. The judge denied without argument plaintiff's motion to strike Dr. Scommengna's testimony as speculative and defendant's motion for directed verdict as to count II. On September 12, 1986, the jury returned a verdict on count II in defendant's favor. Plaintiff's post-trial motion, filed September 18, 1986, was denied by written order filed November 3, 1986. Plaintiff filed her notice of appeal November 20, 1986.

Plaintiff argues the trial court erred in removing consideration of count I from the jury. She contends even though the evidence may have established the cause of the injury, it did not conclusively establish whether negligence occurred. Defendant maintains evidence of specific negligence conclusively established the cause of the injury, extinguishing the right to rely on *res ipsa loquitur*.

It is well established a party is entitled to a directed verdict only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

*Res ipsa loquitur* raises an inference of negligence from otherwise inexplicable facts and circumstances by allowing proof of general negligence through circumstantial evidence. (*Imig v. Beck* (1986), 115 Ill. 2d 18, 503 N.E.2d 324.) The doctrine requires plaintiff to prove (1) the occurrence is one that ordinarily does not occur in the absence of negligence and (2) the defendant had exclusive control of the instrumentality that caused the injury. (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 500 N.E.2d 8.) Plaintiff need only present evidence reasonably showing that elements exist which allow an inference that the occurrence is one that ordinarily does not occur in the absence of negligence. (*Spidle v. Steward* (1980), 79 Ill. 2d 1, 9, 402 N.E.2d 216, 219.) Procedurally, *res ipsa loquitur* creates a permissible inference of negligence which the jury may accept or reject. (*Imig v. Beck* (1986), 115 Ill. 2d 18, 503 N.E.2d 324.) Defendant is entitled to a directed verdict if he introduces evidence which clearly establishes the absence of negligence, thus overcoming the inference as a matter of law. (1 S. Speiser, The Negligence Case §3:9, at 107 (1972).) To direct a verdict for defendant in *res ipsa loquitur* is to conclude plaintiff has not made out a *prima facie* case.

The parties' dispute focuses on principles articulated in *Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 415 N.E.2d 397. In that case, plaintiff brought an action in negligence against three doctors who operated on him. He also sued the hospital in *res ipsa loquitur*. The trial court granted the hospital's motion for summary judgment. The appellate court reversed. The hospital argued *res ipsa loquitur* was inapplicable because plaintiff's introduction of evidence of specific negligence by the doctors defeated his right to rely on the theory. The evidence of specific negligence in question was the testimony of plaintiff's expert during a discovery deposition, in which the expert stated the injury occurred when a bone plug implanted during the operation extruded disc material, which was forced against plaintiff's spinal cord and nerves, causing paralysis.

In affirming the appellate court, the supreme court ruled the opinion of plaintiff's expert did not destroy the inference of negligence raised by *res ipsa loquitur*:

> "The defendant next argues that plaintiff's introduction of evidence of specific negligence extinguishes plaintiff's right to rely on the doctrine of *res ipsa loquitur*. The premise for this argument is that if a plaintiff knows in what respects the defendant was guilty of negligence and presents any specific evidence of the negligent act, the doctrine of *res ipsa loquitur* is inapplicable because direct evidence is no longer within the

exclusive control of the defendant. Defendant's theory would be accurate if the evidence introduced by plaintiff conclusively established the exact cause of his injuries." (*Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 397, 415 N.E.2d 397, 401.)

The expert testimony and the inference of general negligence were to be considered by the jury. The court further stated:

"Our appellate court has consistently permitted a plaintiff to introduce evidence of specific negligence without depriving him of his right to rely on the doctrine of *res ipsa loquitur* where such specific evidence does not conclusively establish the cause of the injury." (*Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 397, 415 N.E.2d 397, 401-02.)

The deposition of plaintiff's expert was treated simply as an opinion upon a state of facts assumed to be true. The court stated the expert's opinion and the inference of general negligence arising from the doctrine would remain to be considered by the jury along with all the other evidence in the case.

■■ Defendant asserts since it is undisputed the stitch in the adventitia caused plaintiff's injury, the cause was conclusively proved, and *Kolakowski* requires the directed verdict granted below. Plaintiff argues identification of the cause does not determine whether the injury would have occurred in the absence of negligence; therefore, the *res ipsa loquitur* count should have been submitted to the jury.

Plaintiff's position is consistent with that of Professor Prosser:

"Plaintiff is of course bound by his own evidence; but, proof of some specific facts does not necessarily exclude inferences of others. When the plaintiff shows that the railway car in which he was a passenger was derailed, there is an inference that the defendant railroad has somehow been negligent. When the plaintiff goes further and shows that the derailment was caused by an open switch, the plaintiff destroys any inference of other causes; but the inference that the defendant has not used proper care in looking after its switches is not destroyed, but considerably strengthened. If the plaintiff goes further still and shows that the switch was left open by a drunken switchman on duty, there is nothing left to infer; and if the plaintiff shows that the switch was thrown by an escaped convict with a grudge against the railroad, the plaintiff has proven himself out of court. It is only in this sense that when the facts are known there is no inference, and res ipsa loquitur simply vanishes from the case. On the basis of reasoning such as this, it is quite generally agreed that the introduction of some evidence which

tends to show specific acts of negligence on the part of the defendant, but which does not purport to furnish a full and complete explanation of the occurrence, does not destroy the inferences which are consistent with the evidence, and so does not deprive the plaintiff of the benefit of res ipsa loquitur." W. Prosser & W. Keeton, Torts §40, at 260 (5th ed. 1984).

We agree with plaintiff. Evidence introduced by plaintiff showed a stitch placed in the peritoneum during the hysterectomy caught the adventitia of plaintiff's left ureter. This evidence is analogous to the open switch in Prosser's example. It eliminated any inference of other causes, but strengthened the inference that defendant did not use due care.

Determining the cause of the injury does not answer the question whether the injury is the type of occurrence that ordinarily happens in the absence of negligence. Here, both parties produced expert witnesses who differed in their views on this issue. Dr. Zatuchni testified catching the adventitia in the stitch fell below the minimum standard of care. Dr. Scommengna stated nothing could have been done to prevent the occurrence and that a stitch in the adventitia does not always indicate malpractice. Whether defendant's evidence is strong enough to overcome plaintiff's *prima facie* case is a jury question. (*Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 449, 207 N.E.2d 305, 307.) The evidence, viewed in a light most favorable to plaintiff, does not so overwhelmingly favor defendant so that no contrary verdict based on that evidence could ever stand. Moreover, the testimony of defendant's expert did not clearly establish the absence of negligence. It was error to direct a verdict for defendant.

■■ Plaintiff asserts the trial court erred in failing to strike Dr. Scommengna's testimony, which plaintiff characterizes as speculative as a whole. Defendant argues the authorities support the trial court's ruling.

It is well established an expert may not guess or state an opinion based on mere conjecture. (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 500 N.E.2d 8.) A physician's testimony was ruled speculative in *Gariti v. Karlin* (1970), 127 Ill. App. 2d 166, 262 N.E.2d 179. In issue was whether plaintiff caused an automobile accident by crossing the centerline. While plaintiff was hospitalized for injuries sustained in that accident, he was diagnosed as suffering from diabetes. Defendant's expert witness stated the accident occurred because plaintiff had untreated diabetes which affected his thought processes and caused the accident. The reviewing court rejected this testimony, stating no evidence existed that the plaintiff was diabetic before the accident or

that plaintiff crossed the centerline.

There is some evidence in the case at bar that plaintiff may have had an old chronic inflammation. Dr. Scommengna noted the pathology report indicated certain adhesions in the plaintiff. However, Dr. Scommengna testified at length about thickening of the peritoneum and resulting lack of pliability which defendant neither noticed during surgery nor included in his operating report. Dr. Scommengna admitted on cross-examination defendant's operating report did not refer to any thickening. We are unpersuaded by his statements that thickening was implied because adhesions were present. Dr. Scommengna speculated on the condition of the peritoneum and testified to a lack of pliability unsupported by the evidence. The trial court should have granted the motion to strike.

■ Finally, plaintiff contends the trial court erred in refusing to give her instruction No. 14A and in giving the court's instruction No. 1. Plaintiff cites no authority for her contentions. This issue is waived under Supreme Court Rule 341(e)(7). 107 Ill. 2d R. 341(e)(7).

Accordingly, the judgment of the circuit court of Champaign County is reversed and remanded for a new trial.

Reversed and remanded.

McCULLOUGH, J., concurs.

JUSTICE LUND, concurring in part and dissenting in part:

I concur with the majority opinion as to reversal because of the directed verdict as to count I, the *res ipsa loquitur* count. I do not agree that the testimony of Dr. Scommengna must be stricken. I do not find that it was based merely on speculation.

The record clearly indicates the injury to the plaintiff resulted from the result of a stitch being placed through the adventitia of the left ureter. This happened when the defendant put a stitch in the peritoneum, following the removal of the left fallopian tube and left ovary, which were adherent to the posterior leaf of the left broad ligament.

To adequately understand what was being said by the medical experts, we define the terminology used.

Peritoneum is defined as follows:

"The membrane which lines the inner surface of the abdomen and the pelvis. The pelvis may be regarded as the lowest part of the abdomen. The peritoneum also covers the organs and structures located within the abdomen and the pelvis. To understand the relationship of the parts, it is useful to visualize the

interior of the abdomen and pelvis as the interior of a room whose walls, ceiling, and floor are covered or 'papered' with a continuous sheet of rubber. The peritoneum corresponding to this rubber sheet is known as the *parietal peritoneum*. We must conceive now that the various organs of abdomen and pelvis originate outside the peritoneum or rubber sheets, or between the rubber sheet and the wall proper [*sic*]. As the organ grows in the space between the rubber sheet (peritoneum) and the wall, they push the rubber before them, thus becoming covered or surrounded by the rubber sheet (peritoneum). Where no organ is pushing its way in, the rubber sheet (peritoneum) remains attached to the wall. The peritoneum which covers or surrounds the intruding organs is called *visceral peritoneum*.

Among the organs which thus push their way into the abdomen, or the abdominal cavity (also called *peritoneal cavity*), are the stomach, the intestine, the liver, the bladder (in the pelvis), etc. In some instances the peritoneum (rubber sheet) closes behind the intruding organ, forming a fold between the organ and the wall. Such a fold of peritoneum is known as a *mesentery*. Some folds are called *ligaments*, as the *broad ligament*." (2 J. E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder P—110 (Matthew Bender 1983).)

See 2 J. E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder P—110 (illustration, peritoneum 1) (Matthew Bender 1983).

A ureter comes from each of the two kidneys and goes to the bladder. (See 2 J. E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder Fig. P—61 (illustration) (Matthew Bender 1983).) The ureters are near the fallopian tubes and ovaries. See 2 Attorneys' Dictionary of Medicine and Word Finder Fig. P—61 (illustration) (Matthew Bender 1983).

The adventitia of the ureter is the outermost of the three layers of tissue forming the wall of the ureter. As indicated, the broad ligament is a fold of the peritoneum. In the present case, the left fallopian tube and left ovary had become attached to the broad ligament (peritoneum), and the left ureter was near or attached to the opposite side of the peritoneum.

Defendant testified he found the left fallopian tube and ovary adherent to the posterior leaf of the left broad ligament. Plaintiff's expert, Dr. Zatuchni, testified the operating report did not mention the thickening of the peritoneum and if it was present, it should be noted in the report. He did say adhesions found at the left ovary and fallopian tube could cause the peritoneum to thicken.

Defendant's expert, Dr. Scommengna, stated that the adherence to the broad ligament was probably a result of an inflammatory process. He stated that when there is such adherence, "in general, there is an inflammatory process." It appears that both doctors find inflammation as a cause of adhesions and a cause of thickening, or lack of pliability, of the peritoneum. Dr. Scommengna indicated that the tube and ovary are usually free, and when they are attached, in general, there is an inflammatory process. He further states the "inflammation does not go toward the tube and ovary. It may go toward the inside, toward the ureter, and if it does that, it makes the tissue less pliable *** ."

Dr. Scommengna testified, within a reasonable degree of medical certainty, that the defendant did not deviate from the necessary standard of care. The medical expert is called for his opinion based on a reasonable degree of medical certainty. The medical expert, using this standard, may give an opinion as to the ultimate issue if the testimony will aid the jury's understanding. (*Perschall v. Metropolitan Life Insurance Co.* (1983), 113 Ill. App. 3d 233, 237, 446 N.E.2d 570, 573.) The reasonable degree of medical certainty standard is not an absolute standard but is acceptable because of the complexities of the science of medicine. Assumptions in a hypothetical medical expert opinion are proper as long as they are within the realm of direct or circumstantial evidence, or are reasonable inferences from established facts. *Smith v. Perlmutter* (1986), 145 Ill. App. 3d 783, 787, 496 N.E.2d 358, 360.

Dr. Scommengna used the terms "probable" and "may" which, according to plaintiff, makes his testimony concerning the pliability and thickness of the peritoneum mere speculation. I do not agree.

We must remember that some doctors who testify as witnesses are not legal experts. They know that their testimony necessarily lacks exactness because of the uncertainties resulting from the complexities of the human body. They should not be discredited for their failure to use the words required by legal niceties if their overall meaning is within the legal boundaries. Dr. Scommengna stated adherence was generally caused by inflammation, and inflammation causes thickness or lack of pliability in the peritoneum. The plaintiff's expert agrees with this. Viewing Dr. Scommengna's testimony most favorable to the defendant, he is saying, considering all of the facts known to him, it is his opinion, based upon a reasonable degree of medical certainty, the injury resulted from the condition of the peritoneum. Regardless of the surgery reports, the opinion is within the realm of the direct and circumstantial evidence. In addition, there are

reasonable inferences from the established facts which justify his opinion.

The left fallopian tube and ovary were adherent to the peritoneum. Inflammation is the general cause of this condition, and inflammation causes thickness and lack of pliability. The plaintiff required the surgery because of medical problems which would infer inflammation. The ureter is usually free of the peritoneum unless the peritoneum has been affected by inflammation. The result of the surgery, with the placement of the stitch, can be considered. All of these facts justify the trial judge's ruling allowing Dr. Scommengna's opinion to stand.

The facts brought out on cross-examination of Dr. Scommengna go to the weight of the testimony not to its admissibility. I would affirm the judgment for the defendant as to count II.