JOHN WEHMEIER *et al.*, Plaintiffs-Appellees, v. UNR INDUSTRIES, INC., *et al.*, Defendants-Appellants (Billy L. Gray *et al.*, Plaintiffs-Appellees).—JOHN WEHMEIER *et al.*, Plaintiffs-Appellants, v. MANVILLE PERSONAL INJURY SETTLEMENT TRUST *et al.*, Defendants-Appellees.—JOHN D. SPICER *et al.*, Plaintiffs-Appellants, v. MANVILLE PERSONAL INJURY SETTLEMENT TRUST *et al.*, Defendants-Appellees.

Fourth District   Nos. 4—90—0361, 4—90—0376, 4—90—0381 cons.

Opinion filed May 9, 1991.

LUND, P.J., concurring in part and dissenting in part.

Michael D. Freeborn, Steven M. Hartmann, and Jane W. Grover, all of Freeborn & Peters, of Chicago, and Margaret S. Garvey, of Freeborn & Peters, of Denver, Colorado, for UNR Industries, Inc., Manville Corporation Asbestos Disease Compensation Fund, Manville Personal Injury Settlement Trust, Charter Consolidated Limited, UNARCO Industries, Inc., Cape Industries Limited, Cape Asbestos Fibres, Ltd., and EGNEP Limited.

James Walker, Ltd., of Bloomington, for John Wehmeier, Helen Bratcher, Evelyn Tynan, Billy L. Gray, Mae Gray, Hazel M. Cochran, Joyce Schultz, John D. Spicer, Gladys Spicer, Juan Mendiola, Sarita Mendiola, Jarvis Long, Etta Long, and Terry W. Grabill.

JUSTICE McCULLOUGH delivered the opinion of the court:

Following a jury trial, judgments were entered against the defendant, the Manville Corporation Asbestos Disease Compensation Fund (Fund), and in favor of plaintiffs Wehmeier, Bratcher, Schultz, Cochran and Bragonier. Judgment was entered for the Fund against plaintiffs Gray and Tynan. The Fund raises the following issues as to the judgments for Wehmeier, Bratcher, Schultz, and Cochran: (1) whether plaintiffs proved asbestos sold by Manville was a proximate cause of their injuries and/or deaths; (2) whether the trial court erred in striking the Fund's defense that conduct of UNARCO Industries, Inc. (UNARCO), was a superseding cause of their injuries; (3) whether the trial court erred in allowing in evidence on plaintiff Wehmeier's increased risk of contracting cancer; (4) whether the trial court erred in allowing plaintiffs to call the treating physicians as expert witnesses in violation of Supreme

Court Rule 220 (134 Ill. 2d R. 220); (5) whether the trial court improperly restricted the Fund's smoking defense; (6) whether the trial court improperly allowed evidence of Manville's plant conditions and injuries to its workers; (7) whether the trial court erred in consolidating seven cases for a single trial; and (8) whether plaintiffs' counsel's questioning regarding settlement negotiations prejudiced the Fund's right to a fair trial. Gray and Tynan raise the following issues as to the judgments entered for the Fund: (1) whether it was error to allow the Fund to present the testimony of its examining physician Skillrud in violation of Supreme Court Rule 215(c) (134 Ill. 2d R. 215(c)); (2) whether the trial court erred in permitting the Fund to submit opinion testimony from its expert, Skillrud, who was not disclosed as required by Supreme Court Rule 220; and (3) whether the trial court erred in permitting the Fund to offer opinion testimony from Dr. Fahey. For the reasons that follow, we reverse all the judgments and remand for a new trial.

Plaintiffs were at one time employed by UNARCO in Bloomington. Plaintiffs' cases against Johns-Manville Corporation and Johns-Manville Sales Corporation (Manville) sounding in negligence and products liability were consolidated for trial. Following Manville's reorganization in bankruptcy, the Fund was substituted as defendant for Manville.

The following judgments were entered against Manville:

| | |
|---|---|
| Wehmeier | $593,054.33 |
| Bratcher | $196,652.00 |
| Schultz | $141,759.00 |
| Cochran | $264,499.00 |

Judgment was entered for Manville against Gray and Tynan. Judgment was entered in favor of Bragonier, but that claim was settled after trial.

At the beginning of the trial, the Fund admitted negligence and wilful and wanton conduct. The trial proceeded solely on the issues of proximate cause and damages.

### EMPLOYEE TESTIMONY

Hazel Cochran testified her husband, Bill, worked for UNARCO for 11 to 12 years before quitting in 1963. Mrs. Cochran stated her husband's health began to deteriorate in the 1980s. Her husband was diagnosed with cancer in April 1989. On cross-examination, Mrs. Cochran stated her husband never talked about his work for UNARCO. Mrs. Cochran stated her husband had been a cigarette smoker for many years.

John Wehmeier, 58 years old at the time of trial, testified he worked at the UNARCO plant from 1951 to 1961. Wehmeier worked in the shipping and receiving department but his job took him all over the plant. Wehmeier testified asbestos blankets, ropes, and pipe covering were made at the UNARCO plant. Wehmeier stated the asbestos yarn, which is two inches thick, came in boxes. The boxes were unpacked and the contents delivered to a roving machine which held large spools. Once on the spools, the asbestos yarn came off like thread used on a sewing machine. The yarn produced dust.

Wehmeier described the UNARCO plant as one big room, long and narrow, like a basketball gymnasium. He stated if you looked at a light, you could see the dust in the air at the plant. There was dust on the floor and the tables, including the tables where the employees ate lunch.

Wehmeier stated the asbestos also came in burlap bags. This asbestos, which had a gray color, looked like rock before it was ground up. After the grinding, the asbestos looked fluffy. Wehmeier stated there were 10 different machines in the plant that worked with asbestos and each one gave off dust.

Wehmeier stated the bags of asbestos were delivered by boxcar to the plant. He picked up the bags by hand and loaded them onto a pallet for unloading by forklift in another part of the plant. Wehmeier stated there were windows near the ceiling of the plant. He recalled asbestos dust collected on the cross-beams on the inside of the outer walls of the plant.

Wehmeier recalled some of the asbestos in the plant came from Manville. Some asbestos from Manville came in on a spool and was used on the roving machine. Wehmeier stopped working in 1984 after he began to experience shortness of breath. Wehmeier admitted smoking cigarettes for 30 years.

On cross-examination, Wehmeier stated the primary product produced at the plant was pipe covering. He stated he did not know what type of asbestos was used in the manufacture of pipe covering. He recalled unloading two boxcars of asbestos fiber per day and the bags of asbestos had the name "Africa" on the bag. Wehmeier stated Manville asbestos came on a spool and had a white color while the Africa asbestos was gray. Wehmeier stated he unloaded boxcars two to three days a month for two to three hours at a time. Wehmeier recalled seeing dust and fibers come off the asbestos yarn and blankets as they were moved. Wehmeier saw dust produced when the asbestos was ground in the machine. Wehmeier

stated after he delivered the asbestos to a machine in the plant, he immediately moved on to another area of the plant. Wehmeier stated he smoked 1½ packs of cigarettes a day and he suffers from emphysema and bronchitis.

Helen Bratcher, administrator for the estate of her husband, Edward Ray Bratcher, testified her husband had worked for UNARCO before she met him from 1954 to 1957. Helen stated her husband got sick in 1978 and could no longer perform his job as a minister. On cross-examination, Helen stated her husband mentioned to her he had worked with Manville asbestos at the UNARCO plant. Helen also stated her husband smoked one pack of unfiltered cigarettes per day until his death in 1980.

Joyce Schultz, administrator for her husband Calvin's estate, testified he worked at the UNARCO plant in the late 1950s for 3½ to 4 years. Joyce admitted her husband was a smoker. Joyce also stated her husband never told her he worked with any asbestos at the UNARCO plant.

Gray testified he worked at the UNARCO plant during 1962 and 1963. Gray began sawing hard board and was promoted to a plant supervisor on the third shift. He had a desk in the middle of the plant near the insulation department and the board department. Gray recalled asbestos yarn and raw asbestos was used in the insulation department but did not know where the asbestos came from. Gray stated he had been a cigarette smoker for 40 years.

Tynan worked at the UNARCO plant in the late 1950s. Tynan died in 1978 of cardiac arrhythmia. Tynan smoked a pack of cigarettes a day for 40 years before his death. There was no evidence presented that Tynan's death was caused by exposure to asbestos.

### MEDICAL TESTIMONY

Herbert Abrams, a board-certified physician in preventive medicine, testified as an expert for plaintiffs. Abrams first began seeing and writing about the hazards of asbestos in 1948. Abrams identified asbestosis as a disease of the lungs caused by inhalation of asbestos fibers. Abrams explained that when asbestos dust is inhaled, the asbestos fibers go into the deepest part of the lung. Areas of inflammation develop around each fiber and, eventually, scar tissue is formed. Scar tissue replaces the normal spongy lung tissues so that, over a period of time, the lung does not perform as efficiently and the person becomes short of breath. Asbestosis shows up on an X ray as shadows. According to Abrams, it is not known what level

of inhalation of asbestos fibers causes the disease because asbestos is a cumulative poison.

Abrams testified exposure to asbestos causes two types of lung cancer: adenocarcinoma and squamous-cell carcinoma. Asbestos exposure also causes mesothelioma, which is cancer in the covering of the lungs. Abrams stated a person may develop more than one disease from asbestos exposure. The latency period for development of· a disease after exposure may be as long as 10 to 20 years. Abrams identified three types of asbestos fibers: chrysotile, amosite, and crykilolite. Ninety percent of the asbestos in the United States is the chrysotile type. According to Abrams, the type of asbestos fiber a person is exposed to does not make any difference in terms of what disease may develop. Abrams stated exposure to asbestos may also cause club fingers.

Abrams reviewed Wehmeier's medical records and concluded he suffered from very advanced fibrosis of the lung caused by exposure to asbestos. Over objection, Abrams also testified Wehmeier had an increased risk of contracting cancer. Abrams stated Wehmeier's X rays revealed shadows in his lungs, scar tissue, and thickening of the pleura or pleural plaques. Wehmeier's X rays established his disease was far advanced and would cause him to have shortness of breath. Abrams stated Wehmeier's prognosis was not good.

Abrams described emphysema as a breakdown of the walls of the alveoli in the lungs caused by a reaction to fibrosis in other parts of the lung. Abrams testified it had to be assumed asbestos was a contributing cause of Wehmeier's emphysema. Abrams stated Wehmeier suffers from chronic bronchitis and chronic obstructive pulmonary disease (COPD), which are also caused by asbestos exposure. COPD is an obstruction of the bronchial tubes in the lungs.

Abrams reviewed Cochran's medical records and concluded he suffered from lung fibrosis and COPD. Both diseases were caused by exposure to asbestos. Cochran's X rays revealed the lower part of his lung was obscured by the fibrotic processes while the upper part was laced with scar tissue. Abrams reviewed the autopsy report for Schultz which recorded the cause of death as pulmonary asbestosis. Abrams stated this disease was caused by exposure to asbestos and silica dust. Abrams stated exposure to asbestos can also affect the heart and Schultz' heart was enlarged.

Over objection, Abrams explained that fibers of asbestos do not stay in the area where they were disseminated but travel to other areas unless exhaust ventilation is used or there is containment of

the release of the fibers. Because the UNARCO plant was an open building, there was no containment of fibers and anyone in the plant was at risk of developing an asbestos-related disease. Abrams stated it was not possible to determine which fiber of asbestos caused the disease because any fiber of asbestos could cause a disease.

On cross-examination, Abrams stated Wehmeier, Schultz, and Cochran were heavy cigarette smokers. Abrams admitted cigarette smoking is an important contributing cause of COPD and he could not say asbestos was a more likely cause of the disease than smoking. Abrams stated that because all three employees were smokers who were exposed to asbestos, both factors, smoking and asbestos, are important in determining the cause of their diseases.

Abrams also stated it was possible to have asbestos fibers in the lung tissues and never develop asbestosis. Abrams opined Cochran's lung cancer may have been caused by exposure to asbestos. Abrams admitted Schultz had an enlarged heart but he also had a history of heart problems and was overweight. Abrams stated that, as he understood it, the machines in the UNARCO plant that processed different types of asbestos were all close together.

On redirect, Abrams stated that, assuming (1) Cochran worked with amosite asbestos in the pipe department at the plant; and (2) Manville delivered 325 tons of chrysotile asbestos to the plant, Cochran could have inhaled some Manville asbestos fibers while he worked at the plant because there is no question that asbestos fibers travelled in the air at the plant.

Paul Nord, a family-practice physician, testified Wehmeier was his patient. Nord stated Wehmeier suffered from asbestosis and stomach ulcers. Nord stated an X ray taken in 1980 showed Wehmeier had the disease then and his condition got worse even though he was no longer exposed to asbestos. Nord stated asbestosis does not manifest itself right away because it can take 15 to 20 years before the disease shows up in an examination. Once asbestos fibers are inhaled and the scar tissue is formed in the lungs, the body cannot stop forming more scar tissue in the lungs. Nord explained the lungs form scar tissue around each fiber of asbestos in the lung and this area then gets red, much like what happens with a splinter in the skin. The more scar tissue formed, the less the lungs can expand.

On cross-examination, Nord stated Wehmeier had been a smoker for 20 to 30 years. Nord admitted smoking shortens a person's life span. Nord stated he had seen 1,000 patients in his practice during

the previous 10 years who had been exposed to asbestos on the job but he only had four to five patients with asbestosis and three patients with mesothelioma. Nord stated he was not familiar with the differences between amosite and chrysotile asbestos fibers and did not know whether some asbestos fibers were more carcinogenic than others.

Charles Wabner, a physician specializing in hematology and oncology, testified he treated Bratcher for the first time in 1979. At that time, Bratcher had already been told by another physician that he had lung cancer. Bratcher's X rays showed the lung pleura was thickened. Wabner stated asbestos could have caused Bratcher's lung cancer. On cross-examination, Wabner stated Bratcher smoked 1 to 1½ packs of cigarettes per day. He developed bronchitis in the hospital before his death in June 1980. Bratcher also had symptoms of emphysema or COPD. With a reasonable degree of medical certainty, Wabner stated asbestos may have been a cause of Bratcher's various diseases.

Robert Conklin, a general thoracic surgeon, testified for plaintiffs. Cochran was his patient. He stated Cochran suffered from asbestosis and lung cancer and both were caused by exposure to asbestos. Conklin saw Cochran for the first time in May 1980. In September 1980, a pulmonary function test revealed Cochran had moderate COPD. Conklin saw Cochran in September 1981 and again in June 1987, at which time Cochran did not complain of any shortness of breath. On cross-examination, Conklin admitted plaintiff's counsel, Walker, had been referring his clients to him for 10 to 15 years. Conklin also testified he thought Gray was suffering from pulmonary asbestosis. On cross-examination, Conklin stated Gray had chronic bronchitis and arteriosclerosis but he (Conklin) was not prepared to say he had asbestosis.

David Skillrud, a physician board certified in pulmonary disease and internal medicine, testified for Manville. Skillrud explained the differences between an obstructive disease and a restrictive disease. An obstructive disease is an impairment manifest in the FEV-1 or forced expiratory volume test. FEV-1 measures the amount of air that can be forcibly expelled within one second of time. A restrictive disease is the inability of the lungs to take in air and force it out of the lungs. A forced vital capacity or FVC test measures the total volume of air that can be forced out of the lung. Skillrud stated a reduction in the FVC test is consistent with asbestos exposure and smoking. Skillrud identified emphysema, chronic bronchitis, and asthma as obstructive diseases and interstitial pulmonary fi-

brosis, asbestosis, and sarcoidosis as restrictive diseases. Skillrud examined Wehmeier and concluded his smoking caused the bronchitis and emphysema. Skillrud admitted Wehmeier had asbestosis but stated it is not possible to determine which company's asbestos caused the disease. Skillrud testified Gray suffered from COPD but it was not caused by asbestos exposure. Skillrud found Gray did not have asbestosis.

On cross-examination, Skillrud stated Wehmeier had an increased risk of contracting lung cancer and mesothelioma because of his asbestos exposure. Skillrud stated Gray had an increased risk of contracting some types of cancer because of his asbestos exposure. Skillrud stated all three types of asbestos caused an increased risk of cancer and each type of fiber is implicated as one of the causes of any disease known to be caused by asbestos exposure. Skillrud stated there is no medical way to exclude one type of asbestos fiber from being the cause for disease. Also, there is no method of determining whether exposure during the first year of employment at UNARCO or the last year of employment caused an asbestos-related disease. Skillrud also stated Gray manifested the beginnings of asbestosis. Skillrud stated cigarette smoking was not a cause of fibrosis for Wehmeier. Skillrud testified that where someone develops COPD from smoking, asbestos exposure is a factor which aggravates the effect smoking has on the lungs.

On redirect, Skillrud stated shortness of breath is not diagnostic of asbestos disease. Further, he stated if a person has asbestosis, his increased risk of cancer is small. However, a person with COPD has an increased risk of contracting lung cancer. Skillrud disagreed with Conklin's diagnosis that Gray had asbestosis.

Patrick James Fahey, a board-certified physician in internal medicine and pulmonary diseases, testified for Manville that an individual's breathing zone is one foot in front of the nose. Fahey could not say, without speculating, that the chrysotile asbestos from Manville was the cause of plaintiffs' medical conditions. Fahey agreed with Skillrud's analysis and testimony regarding restrictive and obstructive diseases. Fahey stated smokers do not develop restrictive diseases. Further, Fahey testified he had not seen a nonsmoking asbestos worker with COPD in his practice. Fahey testified cigarette smoking reduces life expectancy by five years and he noted Bratcher and Schultz died at age 64 and 58, respectively.

Fahey testified there was no evidence of asbestosis in Tynan's X rays and no other clinical evidence of asbestosis. Fahey opined Tynan's death was unrelated to any asbestos exposure. Fahey re-

viewed Wehmeier's medical records and concluded he suffered from interstitial pulmonary fibrosis, secondary to asbestosis and severe COPD, secondary to emphysema. According to Fahey, Cochran's medical records revealed he suffered from pulmonary fibrosis, secondary to asbestosis and metastatic squamous-cell carcinoma. Fahey stated he did not believe COPD and emphysema were related to asbestos exposure but bronchitis may be related. COPD was caused by cigarette smoking. For smokers exposed to asbestos, the risk of contracting lung cancer is 8% to 9%, while the risk among nonsmoking asbestos workers was 6%. According to Fahey, lung cancer was rare in nonsmoking asbestos workers.

On cross-examination, Fahey estimated 90% of males employed as factory workers in the 1960's were cigarette smokers. Fahey stated asbestos fibers remain suspended and aerialized for hours and asbestos dust in one corner of the plant "could" travel to other areas. Fahey stated that asbestos dust so thick that "you could write your name in it" sounded like very high exposure to asbestos.

Fahey stated all types of lung cancer in asbestos workers were asbestos related. Fahey stated Schultz's medical records revealed no clinical evidence but did reveal pathological evidence of asbestosis. Fahey described asbestosis as an inflammatory and fibrotic reaction within the lung to the presence of asbestos. According to this definition, Fahey testified Schultz did have asbestosis.

George Shonat, a general surgeon, testified Tynan had adrenal cancer and suffered from severe emphysema and COPD.

### OTHER EVIDENCE

Plaintiffs presented the testimony of Joseph Sliteris, supervisor of quality control and industrial engineering at the Waukegan plant owned by Manville. Sliteris identified a document generated at the Waukegan plant which indicated that the cause of one plant worker's lung cancer was exposure to asbestos. Sliteris indicated Manville told him that everyone with an occupational exposure to asbestos had the risk of contracting asbestosis.

Plaintiffs presented an employee in the accounting department for UNARCO between 1954 and 1970 to authenticate an exhibit introduced into evidence. This exhibit, which represented the amount of asbestos purchased from Manville by UNARCO, did not set forth the total amount of Manville asbestos purchased, but merely included copies of purchase orders from 1956 to 1969. Further, the purchase orders did not clearly indicate what amount of asbestos was purchased each time. The accounting department employee es-

tablished that amosite asbestos was used in the pipe covering department and estimated two boxcars of amosite asbestos were shipped to the UNARCO plant per day.

In interrogatories admitted into evidence, Manville stated from 1950 through 1972, a total of 679.5 tons of chrysotile asbestos was sold by Manville to UNARCO.

Ed Weaver testified for the Fund that he was plant manager for UNARCO from 1956 to 1962. Weaver testified the main product manufactured at the plant was unibestos or pipe covering. There were four production lines for pipe covering with 20 to 25 employees per shift on each line. The dustiest area of the plant was the sawing department, followed by the feeding department, where raw asbestos was taken out of the bags and fed into the machines. Weaver stated the amosite asbestos used for pipe covering came from South Africa. It came to the plant by boxcar in 100-pound bags. There were 300 to 400 bags per car. Weaver stated chrysotile asbestos was used in making textile materials. Both types of asbestos were used in the insulation department to make asbestos blankets for insulating boilers. Weaver did not recall seeing Manville asbestos in the UNARCO plant while he was there.

On cross-examination, Weaver stated he was unaware of the amount of asbestos Manville shipped to the UNARCO plant. Weaver stated there was no difference between the types of asbestos fibers as far as dust-making capability of each was concerned.

Robert Solomon, a project engineer for UNARCO from 1954 to 1960, testified for the Fund that he spent 20% to 25% of his time while working for UNARCO in the production area of the plant. The primary materials produced there were steampipe insulation, packing materials, and insulation blankets. Amosite asbestos was used in the manufacture of these products. The amosite asbestos came from a company in South Africa. Solomon did not recall seeing any asbestos from Manville in the plant.

On cross-examination, Solomon testified the use limits of asbestos were established by two Federal agencies, the Occupational Safety and Health Administration (OSHA) and the Environmental Protection Agency (EPA). Solomon stated it was his general impression that the level of asbestos used at UNARCO's Bloomington plant was not safe. Solomon stated he never saw chrysotile asbestos ground in a grinder at the plant but did see it on spools. Chrysotile asbestos was not used in the area where Solomon worked but he did see it being used in other areas of the plant he walked through. Solomon stated the asbestos dust got so heavy on the cross-beams

in the plant that it would hang down and sometimes fall to the floor below. Solomon stated the dustiest areas of the plant were the pipe covering department near an asbestos feeding apparatus and the insulation department.

## ANALYSIS

Plaintiffs and the Fund argue various procedural errors require reversal of the jury verdicts returned in this case. Additionally, the Fund presents substantive challenges to the trial proceedings. Because we find the cumulative effect of the procedural errors which occurred below denied the Fund and the plaintiffs a fair trial, we reverse the judgments entered below for the Fund and the various plaintiffs on appeal and remand this cause for a new trial. We will address the procedural errors in turn and the substantive issues which may recur at retrial.

We first consider the issue regarding the settlement negotiations between the plaintiffs and the Fund. On the first day of trial, plaintiffs' first witness was Paul Loehr, chief claims officer for the Fund. The plain purpose of plaintiffs' examination of Loehr, over repeated objections by the Fund, was to present to the jury the process the Fund uses to settle claims for asbestos-related injuries. Plaintiffs' counsel asked the following question of Loehr:

"You and I reached an agreement earlier this afternoon to resolve this case and a Manville Trust lawyer blocked that agreement, isn't that true, Sir?"

The Fund's objection was sustained and the suggestion from the question was stricken from the record. The Fund's motion for a mistrial was denied. Following the proceedings on the day Loehr was called as a witness, a juror asked the following question of a Fund lawyer in the courthouse elevator: "Why don't you guys settle this case so we can all go home?"

The Fund again asked for a mistrial, which was denied. The trial judge stated the following regarding the settlement issue:

"With respect to settlement negotiations, the jury knows that they were required to come in here at 9:00 yesterday morning. The jury knows that the lawyers, the Court, the Bailiffs and the clerk were here at 9:00, and they know that something was going on between 9:00 in the morning and 1:30 in the afternoon when we finally got the first witness on the stand.

Jurors are not dumb, at least I hope they're not, and they surmise that something important is going on to occupy all of

these people's time while they are just sitting there playing cards.

\*\*\* [T]hey know they got sent down to the assembly room to wait, and they know something is going on. And they might very well surmise that something is just exactly that of which the woman juror spoke in the elevator yesterday."

The Fund argues it was denied a fair trial by plaintiffs' counsel's questioning regarding settlement negotiations. Plaintiffs contend it was the witness who mentioned the word "settle" when giving an unresponsive answer to an earlier question posed by plaintiffs' counsel. Plaintiffs maintain their counsel's question regarding settlement negotiations in this case was invited by the Fund's trial tactics. The Fund strenuously urges the conduct of plaintiff's counsel in getting the settlement issue before the jury entitles it to a new trial. We agree with the Fund.

■■ It is well settled that settlement negotiations are ordinarily inadmissible. (*Bowman v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 186, 142 N.E.2d 104; *Nardi v. Kamerman* (1990), 196 Ill. App. 3d 591, 596, 554 N.E.2d 397, 401.) The recognized exception to this rule which holds that admissions to other facts made during settlement discussions may be admissible (*Khatib v. McDonald* (1980), 87 Ill. App. 3d 1087, 410 N.E.2d 266) is inapplicable here. The rationale for this rule is that public policy favors the settlement of claims outside of court. (*Hill v. Hiles* (1941), 309 Ill. App. 321, 32 N.E.2d 933.) In *Sawicki v. Kim* (1983), 112 Ill. App. 3d 641, 445 N.E.2d 63, and *Lasswell v. Toledo, Peoria & Western R.R. Co.* (1976), 41 Ill. App. 3d 568, 354 N.E.2d 25, the courts held reference to settlement negotiations *in arguments to the jury* were sufficient to require a mistrial. In *Sawicki*, the court stated: "These statements once lodged in the minds of the jury could not be erased by an instruction \*\*\*." *Sawicki*, 112 Ill. App. 3d at 646, 445 N.E.2d at 66.

■ It is manifest that plaintiffs' counsel's question directed to a witness appearing before the jury violated the well-settled rule on inadmissibility of settlement negotiations. We disagree with the trial judge's suggestion that no prejudice was suffered by the Fund because the jury had to know the parties were attempting to settle the case on the morning of the first day of trial. We further find no merit to plaintiffs' contention on appeal that the settlement question was invited by the Fund. The prejudice to the Fund's right to a fair trial is without doubt. Therefore, we find reversible error in the denial of the Fund's motion for a mistrial.

■ Next, both sides raise issues regarding the testimony of medical experts and examining physicians called in this case. Specifically, the Fund maintains (1) Abrams was permitted to testify regarding the fiber-drift theory when he was designated to testify regarding medical issues; and (2) Conklin was permitted to testify regarding causation issues when he was called only as a treating physician. The Fund also argues Abrams' testimony on medical issues was improper as it was based on speculation. Plaintiffs Gray and Tynan argue the Fund violated Supreme Court Rules 215(c) and 220 (134 Ill. 2d Rules 215(c), 220) when (1) a written report of Dr. Skillrud's examination of Gray was not received within the time specified in Rule 215(c); and (2) Drs. Skillrud and Fahey were not disclosed as experts as required by Rule 220.

Rule 220 defines an expert as follows:

> "An expert is a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of an average person on a factual matter material to a claim or defense in pending litigation and who may be expected to render an opinion within his expertise at trial. He may be an employee of a party, a party, or an independent contractor." 134 Ill. 2d R. 220(a)(1).

Rule 220 requires all parties to disclose the identity of an expert retained to render an opinion at trial either (1) within 90 days after the substance of his opinion first becomes known to the party or his counsel, or (2) if the opinion is then known, at the first pretrial conference in the case, whichever is later. (134 Ill. 2d R. 220(b).) This rule further provides the court shall enter a scheduling order following the first pretrial conference for the disclosure of all experts not previously disclosed and the scheduling date shall be chosen to ensure that discovery of all experts is *completed no later than 60 days before the date trial is reasonably anticipated to commence.* (134 Ill. 2d R. 220(b).) Failure to comply with discovery or to disclose an expert as required by the rule will result in disqualification of the expert as a witness. 134 Ill. 2d R. 220(b).

■ We first consider Dr. Conklin. The parties do not dispute that Conklin was not designated as an expert prior to trial and that he was a treating physician for Gray. Rule 220 limits the testimony of a physician not designated as an expert to his knowledge of the plaintiffs' treatment while in his care. (*Greene v. Rogers* (1986), 147 Ill. App. 3d 1009, 498 N.E.2d 867.) At trial, Conklin identified X rays taken of Gray and described what various shadows on the X rays revealed about Gray's illness, pulmonary fibrosis. Conklin

also testified over objection that pulmonary fibrosis gets worse over time. The Fund maintains this testimony constitutes an expert opinion. We disagree. Further, taken in context, Conklin was testifying regarding Gray against whom, we note, judgment was entered. It is, therefore, difficult to see what, if any, prejudice was suffered by the Fund by Dr. Conklin's testimony.

■ Regarding Dr. Abrams, the parties do not dispute he was designated in interrogatories before trial as an expert witness on medical issues only. Thus, his testimony on the ability of asbestos fibers to drift throughout the plant was beyond the scope of his designated testimony. Subparagraph (d) of Rule 220 generally confines the scope of an expert's opinion at trial to those facts known or opinions disclosed in the discovery process. (134 Ill. 2d R. 220(d).) Subparagraph (c)(3) of Rule 220 requires a party to supplement his answers to interrogatories given pursuant to Rule 220 as additional information becomes available. (134 Ill. 2d R. 220(c)(3).) The committee comments to Rule 220 state the rule was patterned after the procedural common law and the Federal Rules of Civil Procedure. (Ill. Ann. Stat., ch. 110A, par. 220, Committee Comments, at 439 (Smith-Hurd 1985).) Rule 26 of the Federal Rules of Civil Procedure is similar to Rule 220 and provides in pertinent part as follows:

"(b) ***

\* \* \*

(4) ***

(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. ***

\* \* \*

(e) Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except as follows:

(1) A party is under a duty seasonably to supplement the response with respect to any question directly addressed to *** (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and

the substance of the person's testimony." (Fed. Rules Civ. P. 26(b)(4)(A)(i), (e)(1)(B).)

Several Federal courts have held the violation of this discovery rule by allowing experts to testify beyond the scope of the designated testimony was reversible error. (*Scott & Fetzer Co. v. Dile* (9th Cir. 1981), 643 F.2d 670; *Smith v. Ford Motor Co.* (10th Cir. 1980), 626 F.2d 784.) In *Scott*, the lower court permitted plaintiff, through previous undisclosed witnesses, to advance a new theory for his case. The reviewing court found the lower court abused its discretion in allowing the witnesses, which included one expert witness, to testify over defendant's objection. Similarly, in *Smith*, the court found defendant was prejudiced by a medical expert's testimony on matters beyond those disclosed pursuant to Rule 26. There, the plaintiff disclosed the doctor in question would testify regarding his medical treatment of plaintiff and plaintiff's prognosis. At trial, however, the doctor testified at some length about the connection between plaintiff's injuries and the seat-belt system in the car plaintiff was a passenger in when the accident occurred. The court found defendant was prejudiced in the preparation of its defense by this testimony, which was critical at trial, and its ability to cure the prejudice was "significantly impaired." *Smith*, 626 F.2d at 799.

We conclude the trial court erred in allowing Abrams to testify beyond the scope of his designation as an expert on medical issues. Plaintiffs relied very heavily on the fiber-drift theory to prove their case. The prejudice to the Fund from such testimony is clear.

■ The Fund also contends Abrams was erroneously permitted to testify based on assumptions and speculation. It is well established an expert may not guess or state an opinion based on mere conjecture and guess. (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 500 N.E.2d 8; *Coffey v. Brodsky* (1987), 165 Ill. App. 3d 14, 518 N.E.2d 638.) Expert testimony may be based on data presented to the expert " ' "outside of court and other than by his own perception." ' " (84 Ill. 2d 186, 193, quoting Fed. R. Evid. 703, Advisory Committee Note.)" *J.L. Simmons Co. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.* (1985), 108 Ill. 2d 106, 117, 483 N.E.2d 273, 278.

■ We have considered the testimony the Fund points to and find that it was properly based on Abrams' expert opinion and not on speculation. While Abrams repeatedly used the term "assume" in his testimony, when asked what he meant by it, Abrams replied his opinion was based on his experience with the disease (fibrosis) and his reading.

■ We next consider whether the Fund also violated Rule 220 when it did not timely disclose its experts, Skillrud and Fahey. Skillrud was not disclosed until two days before trial, and while Fahey was disclosed before trial, his opinions were formed two days after trial began.

We first consider Dr. Skillrud. The record reveals the trial court stated the following on November 22, 1989, regarding the examination of plaintiffs by Skillrud and his testimony at trial:

> "I'm also going to order that the plaintiffs submit to, to [sic] a physical examination by a doctor, who has been selected by the defendants, but that if that doctor has not previously been disclosed as an expert witness, that he, he does not automatically become an expert witness. He may testify as to what he observed, but he may not offer opinion testimony unless he has previously been identified as an expert witness, and the physical examination of the plaintiffs is simply to enable him to update what he previously observed in his prior examination. Of course, if he is a [sic], is not being called upon to render opinion testimony, he may testify as to anything which he observed about the conditions of the plaintiffs."

On November 14, 1989, Manville filed a disclosure of experts which included only Dr. Fahey's name. On December 5, 1989, Manville filed another disclosure of experts. On December 18, 1989, an amended disclosure of experts was filed which included Dr. Skillrud's name as an expert for all plaintiffs. In its last disclosure of experts, the Fund stated:

> "This disclosure is made without prejudice to the [ ] Fund's position that no disclosure is required under Rules of the Supreme Court, since there has been no Rule 220 interrogatory or order of the court."

The Fund maintains it did not violate Rule 220 because it disclosed Skillrud within 90 days of ascertaining his opinion and during the course of trial. The Fund relies on our decision in *Illini Aviation, Inc. v. Walden* (1987), 161 Ill. App. 3d 345, 514 N.E.2d 551. The Fund also maintains any delay in the disclosure of Skillrud as an expert is the fault of plaintiffs, who failed to provide necessary medical information, relied upon by Skillrud in forming his opinion, until the eve of trial.

Gray and Tynan respond that the order of November 22, 1989, barred the Fund from presenting Skillrud as an expert because he was not disclosed at that time. Gray and Tynan also assert that

since Skillrud did not use the medical information provided by the Fund to form his opinion, the Fund's delay argument is meritless. The parties do not address the issue of when the Fund became aware of Skillrud's opinion.

In *Illini Aviation*, this court held that where there is no court-ordered discovery order in existence, the disclosure of an expert during the course of trial and within 90 days of ascertaining the expert's opinion was not a violation of Rule 220. We no longer consider *Illini Aviation* good law in light of the supreme court's decision in *Barth v. Reagan* (1990), 139 Ill. 2d 399, 564 N.E.2d 1196. That court rejected the reasoning of *Illini Aviation*, which was espoused by the Fund in the trial court in this case. In support of its decision, the *Barth* court noted (1) that section of Rule 220 regarding completion of discovery no later than 60 days before trial is to commence, and (2) the committee comments indicating this section was meant as " 'a final precaution' " in the event that experts have not been disclosed under the rules of the provisions. (*Barth*, 139 Ill. 2d at 418, 564 N.E.2d at 1205.) The Fund's disclosure of Skillrud was not timely and, therefore, he should have been disqualified as an expert.

We next consider the circumstances of Dr. Fahey's testimony. As noted, Fahey was disclosed as an expert on November 14, 1989, but his opinion was not developed until December 9, 1989, two days after trial began. The Fund contends the medical records for Tynan were not tendered to the Fund as required by court order until after Fahey's deposition on December 4, 1989. Therefore, the Fund was unable to timely disclose Fahey's opinions to plaintiff. Further, the Fund argues it was unaware, until just before trial started on December 7, 1989, that Tynan's case would be tried with those of the other plaintiffs. Thus, timely disclosure was not possible. The Fund maintains Tynan's argument that Fahey's testimony requires a new trial is frivolous.

Plaintiffs respond that according to the Fund, Fahey received Tynan's medical records on December 9, 1989. However, between December 9, 1989, and December 19, 1989, the day Fahey testified, the Fund did not disclose the substance of Fahey's opinion. Plaintiffs argue the Fund should have disclosed Fahey's opinion regarding Tynan during this time.

The record shows Tynan's case was included with the other plaintiffs' cases on December 7, 1989, before trial actually began on December 12, 1989. On December 8, 1989, Tynan's medical records were delivered to the Fund's counsel and given to Fahey to review

on December 9, 1989. The earliest Fahey formed an opinion regarding Tynan's case was December 9. In an earlier deposition on December 4, 1989, Fahey had not formed an opinion regarding Tynan because he had not seen his medical records. Fahey was the last witness to testify for the Fund on December 19, 1989, the last day of trial. On that day, after seeing Fahey in the courtroom, the plaintiffs presented a motion *in limine* to preclude Fahey from giving opinion testimony regarding Tynan and two other plaintiffs. The court denied the motion and allowed Fahey to testify after permitting plaintiffs' counsel to interview him.

The Fund could have disclosed Fahey's opinion to plaintiffs but did not do so for 10 days. The Fund offers no explanation for this delay but focuses on the actions of plaintiffs' counsel, who allegedly failed to comply with discovery and disclose needed medical records.

The actions of both parties in this case regarding discovery and disclosure of information were a far cry from the orderly trial preparation countenanced by the supreme court rules. Both sides contravened the intent and spirit behind Rule 220, which was to eliminate "last-minute disclosure of experts on the courthouse steps or during the course of trial." (Ill. Ann. Stat., ch. 110A, par. 220, Committee Comments, at 438 (Smith-Hurd 1985).) Such actions operate to the detriment of the parties involved and should not be tolerated by trial judges. On retrial, such actions should not recur under threat of sanctions.

Gray and Tynan also argue the trial court erred in allowing the Fund to present the testimony of Skillrud's physical examination of them because the written report of the examination was not received within the time period specified in Supreme Court Rule 215(c). (134 Ill. 2d R. 215(c).) Gray and Tynan rely on *Harris v. Minardi* (1966), 74 Ill. App. 2d 262, 220 N.E.2d 39. The Fund argues Rule 215(c) was not violated because, in granting the Fund's motion that Gray be examined by Skillrud, the court modified the time requirements of Rule 215(c).

Rule 215(c) provides:

"Within 21 days after the completion of the examination, and in no event later than 14 days before trial, the examining physician shall prepare duplicate originals of a written report of the examination, setting out his findings, results of all tests made, his diagnosis and conclusions, and deliver or mail an original of his report and of all corrections, supplements, or additions thereto, to the attorney for the party requesting

the examination and a duplicate original thereof to the attorney for the party examined or for the party who produced the person who was examined. The court may enforce compliance with this requirement. If the report is not delivered or mailed to the attorney for the party examined, or for the party who produced the person who was examined, within the time herein specified or within any extensions or modifications thereof granted by the court, neither the physician's report nor his testimony or his findings or X-ray films or the results of any tests he has made may be received in evidence except at the instance of the party examined or who produced the person examined." (134 Ill. 2d R. 215(c).)

In *Harris*, the court determined the express language of the rule evidenced that the furnishing of the medical report within the time specified was mandatory and failure to so furnish the report required the court to bar the presentation of the doctor's testimony.

On November 22, 1989, the court granted the Fund's request that Gray be examined by Skillrud. Contrary to what the Fund suggests, there is no indication the time period in Rule 215(c) was extended by the court. Trial began on December 7, 1989, and the report was received on December 5, 1989, less than 14 days before the trial began. We agree with the reasoning in *Harris* and conclude the trial court erred in allowing Skillrud to testify regarding his examination of Gray.

We now consider other claims raised in this appeal because they may recur on retrial. The Fund's main argument for reversal of the judgments for plaintiffs is that plaintiffs' evidence failed to establish Manville asbestos was the proximate cause of their injuries. Under Illinois law, a plaintiff has the burden of proving by a preponderance of the evidence that the defendant caused the plaintiff harm or injury; mere conjecture or speculation is insufficient proof. (*Smith v. Eli Lilly & Co.* (1990), 137 Ill. 2d 222, 232, 560 N.E.2d 324, 328.) In a negligence action, the causation-in-fact requirement entails a reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered. (*Smith*, 137 Ill. 2d at 232, 560 N.E.2d at 328, citing *Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 117 N.E.2d 74.) Under the substantial-factor test for causation in fact, the actual cause of a plaintiff's injury is established where the defendant's conduct is a material element and a substantial factor in bringing about the plaintiff's injury. *Turner v. Roesner* (1990), 193 Ill. App. 3d 482,

490, 549 N.E.2d 1287, 1292; see also Restatement (Second) of Torts §431 (1965).

■■ Causation is the same in a products liability action as it is in a negligence action. The plaintiff must establish some causal relationship between the defendant and the injury-producing agent. *Smith*, 137 Ill. 2d at 233, 560 N.E.2d at 328, citing M. Polelle & B. Ottley, Illinois Tort Law 581 (1985); see also *Schmidt v. Archer Iron Works, Inc.* (1970), 44 Ill. 2d 401, 256 N.E.2d 6; *Amin v. Knape & Vogt Co.* (1986), 148 Ill. App. 3d 1075, 1078, 500 N.E.2d 454, 456.

■■ Several courts in Illinois have held that proximate cause in an asbestos case is proved only where there is evidence of exposure to *a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked.* (*Naden v. Celotex Corp.* (1989), 190 Ill. App. 3d 410, 546 N.E.2d 766 (no evidence justifying inference that decedent was exposed to defendant's products); *Estate of Henderson v. W.R. Grace Co.* (1989), 185 Ill. App. 3d 523, 541 N.E.2d 805 (plaintiff's evidence failed to indicate whether a specific product of defendant was actually used at plaintiff's place of employment); *Zimmer v. Celotex Corp.* (1989), 192 Ill. App. 3d 1088, 549 N.E.2d 881 (plaintiff's evidence failed to identify particular product of defendant's used at particular times or that plaintiff was in proximity to that product when it was used).) The vast majority of State and Federal courts considering asbestos cases have adopted the test as set forth in *Lohrmann v. Pittsburgh Corning Corp.* (4th Cir. 1986), 782 F.2d 1156, 1162, the so-called "frequency, regularity, and proximity test." *Hoffman v. Allied Corp.* (11th Cir. 1990), 912 F.2d 1379 (Florida law); *Blackston v. Shook & Fletcher Insulation Co.* (11th Cir. 1985), 764 F.2d 1480 (Georgia law); *Odum v. Celotex Corp.* (11th Cir. 1985), 764 F.2d 1486 (Georgia law); *Lee v. Celotex Corp.* (11th Cir. 1985), 764 F.2d 1489 (Georgia law); *Robertson v. Allied Signal, Inc.* (3d Cir. 1990), 914 F.2d 360 (Pennsylvania law); *Menne v. Celotex Corp.* (10th Cir. 1988), 861 F.2d 1453 (Nebraska law); *Thompson v. Johns-Manville Sales Corp.* (5th Cir. 1983), 714 F.2d 581; *Sholtis v. American Cyanamid Co.* (1989), 238 N.J. Super. 8, 568 A.2d 1196.

The *Lohrmann* court noted the test required a plaintiff to prove more than a casual or minimum contact with the product. In *Lohrmann*, the court directed a verdict for four asbestos defendants after finding there was insufficient evidence of causation presented. Plaintiffs' evidence established only that the defendants' product was at the workplace while plaintiff was employed there. The court

noted that the applicable State law (Maryland) required evidence from which a jury could reasonably find that conduct of the defendant was a substantial factor in bringing about the result. (*Lohrmann*, 782 F.2d at 1162.) In the case before it, the *Lohrmann* court adopted the following rule:

> " 'Whether a plaintiff could successfully get to the jury or defeat a motion for summary judgment under such a theory would depend upon the frequency of the use of the product and the regularity or extent of the plaintiff's employment in proximity thereto.' " (*Lohrmann*, 782 F.2d at 1162.)

The *Lohrmann* court found the rule was a reasonable one in light of the State law of substantial causation, the nature of plaintiffs' asbestos-related disease (asbestosis) and the size of plaintiffs' workplace, a shipyard.

In *Blackston*, the court stated that if plaintiffs were not held to the same strict standard of proof of causation in asbestos cases as was required in any negligence case, the result would be adoption of a market-share or industry-wide theory of liability. (*Blackston*, 764 F.2d at 1483.) The *Blackston* court noted the strong policy reasons which militated against adoption of such a theory:

> "First, elimination of a causation requirement would render every manufacturer an insurer not only of its own products, but also of all generically similar products manufactured by its competitors. [Citation.] Second, expanding culpability of asbestos manufacturers could reduce the ability to spread losses by insurance and otherwise distribute risk. [Citation.] Third, application of such a novel theory of causation would raise serious questions of fairness due to the fact that different manufacturers' asbestos products differ in degrees of harmfulness." *Blackston*, 764 F.2d at 1483.

The Fund argues there is no evidence that any of the five successful plaintiffs here were *directly* exposed to any asbestos supplied by Manville. The Fund contends proximate cause is established in an asbestos case the same as it is in any products liability case: a plaintiff must prove with reasonable certainty that a particular defendant's product caused the injury. While circumstantial evidence may be used to establish proximate cause, the inference drawn must be one of probability, not mere possibility of exposure to an asbestos product. The Fund contends one plaintiff, Wehmeier, established he was exposed to Manville asbestos, but because the amount of Manville asbestos in relation to other types was *de mini-*

*mus,* Wehmeier did not prove Manville asbestos was a substantial factor in bringing about his injuries.

Plaintiffs urge the evidence before the jury satisfied the *Lohrmann* frequency, regularity, and proximity test. Plaintiffs contend the evidence established Manville asbestos was used in the plant, that asbestos fibers were released inside the plant and that those fibers drifted throughout the plant. Relying principally on the so-called fiber-drift theory, plaintiffs strenuously urge proximate cause was proved in this case as to all plaintiffs.

We focus our discussion of causation on the fiber-drift theory advanced by plaintiffs in order to determine whether it is a viable theory under Illinois law. Contrary to the Fund's assertion, no court in Illinois has yet squarely addressed the viability of this theory. As *Robertson* states:

> "The substance of the fiber drift theory is that once an asbestos-containing product can be placed *anywhere* in the Firestone plant, any plaintiff working at any point within that plant is entitled to have the question of causation submitted to the jury because it is likely, given that fibers can drift, that a given plaintiff was exposed to fibers originating in a particular defendant's product." (Emphasis in original.) (*Robertson,* 914 F.2d at 376.)

Under the theory, the specific locale of the product's use and the specific areas of a plaintiff's employment become irrelevant. (*Robertson,* 914 F.2d at 376.) When considered with the *Lohrmann* test, the fiber-drift theory relates only to proximity and does not establish how often a particular product was used or how often a worker was present in an area where fibers may have drifted. *Robertson,* 914 F.2d at 383.

In those cases which have considered this theory, the courts have concluded the fiber-drift evidence was sufficient to support a jury verdict (*Eagle-Picher Industries, Inc. v. Balbos* (1990), 84 Md. App. 10, 578 A.2d 228; *Lockwood v. AC & S, Inc.* (1987), 109 Wash. 2d 235, 744 P.2d 605) and sufficient to survive a motion for summary judgment (*Robertson,* 914 F.2d 360). However, the *Lockwood* and *Robertson* courts disagree fundamentally on the degree of reliance afforded to and importance of fiber-drift evidence. In the face of such evidence, the *Lockwood* rule dispenses with the *Lohrmann* test, while the *Robertson* court found the fiber-drift theory related to only one prong of the *Lohrmann* test and, therefore, such evidence cannot stand alone to establish causation.

We adopt the *Lohrmann* test used to establish causation in asbestos cases. Further, we conclude reliable expert evidence of fiber drift may be used to establish the proximity prong of the *Lohrmann* test. Thus, we agree with the *Robertson* court that fiber-drift evidence cannot alone support an inference of causation but must be accompanied by evidence establishing how frequently the particular asbestos product was used, the area in which it was used, and the regularity of a plaintiff's employment within a zone covered by the reach of fiber drift. Necessarily, each case must stand on its own facts. Given the various diseases which are associated with asbestos exposure, the medical evidence presented, the types of asbestos involved, the manner in which the products are handled, and the tendency of those asbestos products to release asbestos fibers into the air (see *Lockwood*, 109 Wash. 2d at 249, 744 P.2d at 613), the amount of evidence needed to establish the regularity and frequency of exposure will differ from case to case. For example, none of the plaintiffs in this case were diagnosed with mesothelioma, an asbestos-related disease which is caused after only minor exposure to asbestos dust. Asbestosis, on the other hand, develops after a more substantial exposure to asbestos. Additionally, we consider the actual workplace in a given case is important. The workplace in this case was a large, open production plant described as the size of a basketball gymnasium, with no interior walls or partitions between departments and no ventilation except for windows near the ceiling.

■■■ Further, contrary to the Fund's argument, we do not find the fiber-drift theory contravenes the substantial-factor test for causation. As we construe the Fund's argument, the fiber-drift theory should be rejected because it would allow plaintiffs to recover after establishing exposure to only one asbestos fiber as opposed to many or *a substantial number* of fibers. The substantial-factor test is not concerned with the *quantity* of the injury-producing agent or force but rather with its *legal significance*. (W. Keeton, Prosser & Keeton on Torts §41, at 267 (5th ed. 1984); *McDowell v. Davis* (1968), 104 Ariz. 69, 448 P.2d 869.) Where there is competent evidence that one or a *de minimus* number of asbestos fibers can cause injury, a jury may conclude the fibers were a substantial factor in causing a plaintiff's injury. We express no opinion on the ultimate resolution of the issue in this case.

The Fund next argues its affirmative defense that UNARCO's failure to implement adequate industrial hygiene practices, such as medical monitoring of employees, mandatory respirator use, and installation of dust-control equipment, was a superseding cause of

plaintiffs' injuries was improperly stricken by the trial court. The trial judge barred the evidence of UNARCO's failure to warn its employees, reasoning that "Illinois does not recognize intervening causes except where somebody is complying with a governmental specification." The Fund contends whether the intervening act of a third party was the cause of an injury is a jury question and it should not be decided as a matter of law.

A superseding, intervening cause is a subsequent independent action which breaks the causal relationship between the original wrong and the injury and it, rather than the original wrong, causes the injury. (*Kirk v. Michael Reese Hospital & Medical Center* (1985), 136 Ill. App. 3d 945, 483 N.E.2d 906.) The intervention of an independent action will not break a causal connection if the intervention of the action was itself reasonably foreseeable. (*Kirk,* 136 Ill. App. 3d at 951, 483 N.E.2d at 910.) Whether an intervening act was foreseeable is usually a jury question, except where the facts demonstrate the plaintiff may never be entitled to recovery, when it is decided as a matter of law. *Medina v. Air-Mite Devices, Inc.* (1987), 161 Ill. App. 3d 502, 515 N.E.2d 770.

Plaintiffs argue the superseding cause defense is not specifically recognized in Illinois as an affirmative defense. We do not view this argument as responsive to the issue the Fund raises. The issue is whether the Fund should be entitled to present evidence of UNARCO's actions to support its claim that those actions were an intervening, superseding cause of plaintiffs' injuries. Evidence of a superseding cause is admissible in Illinois in negligence and strict liability cases. (*Rowe v. State Bank* (1988), 125 Ill. 2d 203, 531 N.E.2d 1358; *Pell v. Victor J. Andrew High School* (1984), 123 Ill. App. 3d 423, 462 N.E.2d 858; *Soto v. E.W. Bliss Division of Gulf & Western Manufacturing Co.* (1983), 116 Ill. App. 3d 880, 452 N.E.2d 572.) However, no Illinois case has allowed the superseding cause defense in an asbestos case.

The Fund directs us to *Menna v. Johns-Manville Corp.* (D. N.J. 1984), 585 F. Supp. 1178, where the Federal court noted there were no State (New Jersey) cases which had expressly held the defense was available in products liability cases. However, the district court reasoned that since the New Jersey courts had not narrowed the concept of proximate cause in products liability cases, the defense was available. Similarly, in *In re Related Asbestos Cases* (N.D. Cal. 1982), 543 F. Supp. 1142, the court held a superseding cause was a defense to strict liability in tort, reasoning strict liability has never meant *absolute liability* and it was for the trier of fact to deter-

mine whether the superseding cause was the proximate cause of the injuries.

We conclude the Fund is entitled to present evidence at trial on UNARCO's actions as the superseding cause of plaintiffs' injuries. The plaintiffs may undercut the evidence of superseding cause by showing UNARCO's actions were foreseeable. Further, the trial court may, depending on the evidence, determine as a matter of law that there is no superseding cause in this case. We express no opinion on the success or outcome of this matter on retrial but merely hold the Fund is entitled to the opportunity to present such evidence.

The Fund next argues the trial court erred in allowing plaintiff Wehmeier to introduce evidence of his increased risk of contracting cancer because of his exposure to asbestos. The Fund contends this evidence was speculative and, thus, did not constitute a present, compensable injury. We agree.

In *Morrissy v. Eli Lilly & Co.* (1979), 76 Ill. App. 3d 753, 394 N.E.2d 1369, the court denied recovery for possible future injuries which may be incurred as a result of exposure *in utero* to the drug diethylstilbestrol (DES). That court reasoned as follows:

> "The nexus thus suggested between exposure to DES *in utero* and the possibility of developing cancer or other injurious conditions in the future is an insufficient basis upon which to recognize a present injury. In Illinois, possible future damages in a personal injury action are not compensable unless reasonably certain to occur." *Morrissy,* 76 Ill. App. 3d at 761, 394 N.E.2d at 1376.

In *Gideon v. Johns-Manville Sales Corp.* (5th Cir. 1985), 761 F.2d 1129, the court determined that medical evidence establishing it was more likely than not that plaintiff would develop cancer in the future was admissible because its probative value outweighed any prejudice to the defendant. The medical experts in *Gideon* established (1) plaintiff had a greater than 50% risk of contracting cancer; and (2) there was no doubt the plaintiff would die of an asbestos-related malignancy. In *Adams v. Johns-Manville Sales Corp.* (5th Cir. 1984), 727 F.2d 533, the court held such evidence was properly excluded because plaintiff presented no evidence of the likelihood he would develop cancer.

Testimony in this case regarding the increased risk of contracting cancer related to a future injurious condition which is not compensable unless it is reasonably certain to occur. Plaintiffs did not establish it *was a reasonable medical probability* that Wehmeier

will contract cancer. Damages may not be awarded on the basis of conjecture or speculation and must be proved to be the proximate result of the complained of wrong. (*Callier v. Callier* (1986), 142 Ill. App. 3d 407, 491 N.E.2d 505.) The evidence *as presented* on the increased risk of contracting cancer should not have been admitted.

The Fund next argues the trial court improperly restricted its defense that cigarette smoking was a cause of plaintiffs' medical conditions. The record shows plaintiffs filed a motion *in limine* to preclude the Fund from referring to or implying that plaintiffs' use of tobacco constituted negligence. The court granted the motion and stated:

> "I am going to require that you *** make a showing outside of the presence of the jury that tobacco could cause the injury which has been proved or that it can significantly contribute to [or] worsen the condition which has been proved, if any. And if you can do that, then I will allow evidence as to use of tobacco by a plaintiff, but I think you do have to establish *** that exposure to asbestos fibers causes people's toenails to grow to the right, and the exposure to tobacco causes people's toenails to grow to the left, and you are going to have to show, you know, that there is something of that kind."

During trial, the trial judge refused to reconsider the *in limine* order. Later, following testimony from Dr. Abrams that plaintiffs have a reduced life expectancy due to their cigarette smoking, the court instructed the jury that the evidence of cigarette smoking was to be considered for the limited purpose of determining the reduced life expectancy of each plaintiff because of his exposure to asbestos. Following the testimony of Dr. Skillrud, the court vacated the *in limine* order and allowed the Fund to present evidence that cigarette smoking was the proximate cause of certain obstructive diseases such as COPD, bronchitis, and emphysema.

■■ The Fund argues evidence of plaintiffs' cigarette smoking is relevant to the causation issue and has been so held in a majority of the reported cases. Several courts have held that evidence of cigarette smoking is admissible in an asbestos-related injury case on the issues of causation and damages. In *Brisboy v. Fiberboard Corp.* (1988), 429 Mich. 540, 418 N.W.2d 650, the court stated the jury could have determined plaintiff's smoking was also a cause of plaintiff's disease. In *Fulgium v. Armstrong World Industries, Inc.* (W.D. La. 1986), 645 F. Supp. 761, the court determined that under comparative negligence principles, plaintiff's cigarette smoking was

admissible in an asbestos case. The court did not require the defendant to establish beforehand that cigarette smoking was a substantial factor in causing plaintiff's injuries. Similarly, in *Gideon* (761 F.2d 1129), the court held cigarette-smoking evidence was admissible because it directly related to the extent of damage caused by the inhalation of asbestos fibers. The court noted the jury was capable of sifting through and weighing the evidence as to each potential cause.

We conclude the smoking evidence was relevant to the issues of causation and damages and should have been admitted on these issues without restriction.

Next, we find the trial court erred in allowing plaintiffs to present evidence of plant conditions at other Manville plants and injuries to Manville employees. As the Fund points out, no evidence was presented as to whether the Waukegan plant was similar to the UNARCO plant in Bloomington and what type of asbestos and working conditions the Waukegan workers were exposed to. Since the Fund admitted prior to trial knowledge of the hazards of asbestos and its failure to warn of them, it argues this evidence was not relevant to any fact of consequence in the action.

■■ Relevant evidence is that evidence which tends to establish a fact in controversy or to render a proposition in issue more or less probable. (*McLaughlin v. Rush-Presbyterian-St. Luke's Medical Center* (1979), 68 Ill. App. 3d 546, 386 N.E.2d 334.) The determination of whether evidence is relevant is largely within the discretion of the trial court and its decision will not be disturbed absent an abuse of discretion. (*Carlyle v. Jaskiewicz* (1984), 124 Ill. App. 3d 487, 464 N.E.2d 751.) The Fund admitted Manville's knowledge of hazards and failure to warn of them. The evidence of Waukegan plant conditions concerned these issues and was not relevant to any issue in controversy. We find the trial court abused its discretion in allowing the evidence to be presented to the jury.

■■ Finally, we conclude the trial court's consolidation of seven plaintiffs' cases in a single trial did not deprive the Fund of a fair and impartial trial. The record reveals there were initially three, not seven, separate actions in the trial court. These actions were consolidated at the request of the parties.

Section 2—1006 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1006) provides for consolidation of actions pending in the same court "as an aid to convenience, whenever it can be done without prejudice to a substantial right." The trial court has broad discretion in considering a motion to consolidate

(*Horn v. Rincker* (1981), 84 Ill. 2d 139, 417 N.E.2d 1329), and its decision will not be overturned on review absent a finding of an abuse of discretion. *Joppa High School District No. 21 v. Jones* (1976), 35 Ill. App. 3d 323, 341 N.E.2d 419.

We find no abuse of discretion and conclude that *Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 463 N.E.2d 792, relied upon by the Fund, is easily distinguished from this case. In *Lowe*, the trial court consolidated 47 separate lawsuits for a single trial. The reviewing court found consolidation substantially prejudiced the defendant's case and, given the complexities of the case and the random fashion in which it was presented to the jury, it was highly unlikely the verdicts could have been based upon the evidence. The circumstances of this case are not the same.

For the foregoing reasons, all the judgments entered in this case are reversed, and this cause is remanded to the trial court for a new trial consistent with this opinion.

Reversed and remanded.

SPITZ, J., concurs.

PRESIDING JUSTICE LUND, concurring in part and dissenting in part:

I dissent from only a limited part of the majority opinion. The issues discussed in that opinion illustrate the problems presented nationally with asbestos cases. Almost without exception, I believe the opinion is well reasoned and comes to correct conclusions.

While concurring with the granting of a new trial, I find it necessary to discuss the proximate-cause issue as it relates to evidence of whether Manville asbestos was used in the UNARCO plant when plaintiffs were exposed. I am a panel member in *Thacker v. UNR Industries, Inc.* (1991), 213 Ill. App. 3d 38, where we initially decided that evidence of use of the Manville product was insufficient to sustain a finding of proximate cause. A petition for rehearing in *Thacker* was granted, and a decision on rehearing will be filed immediately following the filing of the opinion in the present case. We now conclude that our original decision, now technically a nullity, was in error. *Thacker* involved the same plant and some of the same time periods as in the present case. Proof of when the Manville product was used in the UNARCO plant is difficult to establish, due to the time period between employment of the various victims and the time illnesses were discovered. Old records have

disappeared, and the ones that remain do not provide exact answers. After review, we now conclude that adequate evidence was presented in *Thacker* to sustain a finding that Manville asbestos was the proximate cause of the injury. It is not necessary to go into a lengthy description of the drift theory and how it establishes the strong possibility of fiber circulating throughout the plant.

The evidence in *Thacker* indicated that during Thacker's employment the largest amount of asbestos used by the plant, by far, came from companies other than Manville. However, Manville asbestos was used and necessarily resulted in additional fiber in the air flow. No one can say which kind of fiber or fibers contributed to the injury of employees. Considering the nature of asbestos and the knowledge by the asbestos industry of its dangerous propensities, a broad view toward liability should be taken. Defendants have acknowledged wilful and wanton conduct, and they should not be benefited by narrow or strict interpretation of proximate cause. In asbestos cases, where two or more companies contributed to asbestos fiber being in the air when and where an injured person was working, all should be held liable.

I dissent in the present case on the issue of intervening cause. I would hold that it has been established as a matter of law that suppliers of asbestos were aware of production methods used by those they supplied, and they were well aware of the dangerous propensity of the material. Because of this knowledge, I conclude that asbestos suppliers should not, as a matter of law, be allowed to claim an intervening cause as a defense based upon the manufacturing plant's failure to provide adequate protection.

A new cause can intervene or break the sequence between the original wrongful act and the injury, so that a cause of injury is traceable only to the intervening act. However, an intervening act will not prevent an original act from being a proximate cause of the injury, if the wrongful act extended in an unbroken sequence from the wrong to the injury and the injury was the natural and probable consequence of the wrongful act. (*Berg v. New York Central R.R. Co.* (1945), 391 Ill. 52, 64, 62 N.E.2d 676, 682.) The suppliers knew of the dangers of the asbestos, gave no warning of the dangers, and put the asbestos in the chain of commerce knowing how it was being used. The injury was a product of the unbroken sequence and was a natural and probable sequence of the supplier's actions.