Jesse and Dorothy **CAREY**, married individuals; Nicholas and Deborah Dassion, married individuals, Rebekah Dassion, a minor by Nicholas Dassion her father, as natural guardian and next friend, and Mihailo and Janet Bozidarevic, married individuals, on behalf of themselves and all persons similarly situated, Plaintiffs,

v.

**KERR-McGEE CHEMICAL CORPORATION**, a Delaware Corporation, and Kerr–McGee Corporation, a Delaware Corporation, Defendants.

No. 96 C 8583.

United States District Court,
N.D. Illinois,
Eastern Division.

March 17, 1998.

Paul Joseph Fina, Downers Grove, IL, Steve W. Berman, Paul M. Weiss, Hagens & Berman, Seattle, WA, Thomas A. Demetrio, Daniel M. Kotin, David Casey Wise, Corboy & Demetrio, Chicago, IL, for Plaintiffs Jesse Carey, Dorothy Carey, Nicholas Dassion, Deborah Dassion, Rebekah Dassion.

Michael Jerry Freed, Much Shelist Freed Denenberg, Ament Bell & Rubenstein, P.C., Chicago, IL, Paul Joseph Fina, Downers Grove, IL, Eric D. Freed, Law Offices of Eric D. Freed, Los Angeles, CA, Steve W. Berman, Paul M. Weiss, Hagens & Berman, Seattle, WA, Thomas A. Demetrio, David Casey Wiise, Corboy & Demetrio, Chicago, IL, for Plaintiffs Mihailo Bozidarevic, Janet Bozidarevic.

Michael P. Connelly, Raymond Eugene Stachnik, Matthew Patrick Connelly, Connelly & Schroeder, Chicago, IL, Richard A. Meserve, Peter J. Nickles, Elliott Schulder, Alan A. Pemberton, Covington & Burling, Washington, DC, for Defendants Kerr–McGee Chemical Corporation, a Delaware Corporation, Kerr–McGee Corporation, a Delaware Corporation.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

Plaintiffs Jesse and Dorothy Carey, Nicholas and Deborah Dassion, Rebekah Dassion, by her father Nicholas Dassion as natural guardian and next friend, and Mihailo and Janet Bozidarevic have filed a five count putative class action complaint against defendants Kerr–McGee Chemical Corporation and its parent, Kerr–McGee Corporation (collectively, "defendants") alleging property damage and personal injury resulting from thorium tailings produced at defendants' West Chicago facility. Counts I and II are for property damage, alleging continuing trespass and nuisance, respectively. Counts III, IV and V contain claims for both property damage and personal injury ("medical monitoring claims"), alleging strict liability for ultra-hazardous activity, negligence, and willful and wanton conduct. Defendant has moved for summary judgment on all counts based on the statute of limitations and laches. That motion addresses all claims against the adult defendants. In addition, defendants have moved to dismiss plaintiffs' claims for medical monitoring for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below defendants' motions are granted in part and denied in part.

### Facts

This is the latest in a long line of lawsuits arising out of the thorium tailings produced at a rare earth facility (the "Facility") located in West Chicago. The Facility, a 43 acre site within the town of West Chicago, originally operated in 1931 by Lindsey Light and Chemical Co. and later by American Potash and Chemical Corp., was primarily engaged in extracting thorium from monazite ore. This extraction or "milling" resulted in large quantities of sand-like low level radioactive byproducts called thorium tailings. Defendants acquired the Facility in 1967 and ceased operations six years later in 1973. It is undisputed that prior to defendants' acquisition of the Facility, thorium tailings had been deposited at public locations, including Reed–Kepler Park, an 88 acre site owned by the City of West Chicago (the "City") and leased to the DuPage County Park District, the West Chicago sewage treatment plant, and a portion of a field adjacent to the West Chicago High School. In addition, Facility employees and area residents were allowed to remove tailings for use in landscaping and as landfill.

In 1976 an anonymous call to a newspaper led to a Nuclear Regulatory Commission ("NRC") investigation of all off-site waste contamination. This was the beginning of what became a massive investigation by both state and federal agencies, as well as the local and national news media. Despite plaintiffs' attempts to characterize it otherwise, it is uncontrovertible that from 1976 through the entire 1980s and into 1990–91, there was extensive, widespread publicity both in print and broadcast multimedia (local and national) of the thorium tailings problem and its potential hazards. The extent of the news coverage is far too staggering to detail fully in this opinion. Nevertheless, some detail is required to give perspective to both defendants' and plaintiffs' positions regarding the limitations issues.

In July 1976 Dan Coyne, a City resident, filed a lawsuit against defendant alleging that the disposal of radioactive material at the Facility threatened the health and safety of West Chicago residents because of potential contamination of the water supply. The lawsuit, which was ultimately dismissed because the state law claims were preempted by federal law and the NRC authority, was reported in the July 12, 1976, edition of the *Chicago Tribune*. In September 1978 Argonne National Laboratories issued a report for the NRC entitled "Thorium Residuals in West Chicago, Illinois" based on tests conducted in 1976 through 1978. The report indicated 75 thorium residual areas in addition to the Facility, Reed–Kepler Park, the sewage treatment plant and other areas previously identified by the NRC. In November of that year the press reported that the United States Environmental Protection Agency ("EPA") had listed the Facility as a hazardous site, describing it as "hazardous to health." One month later, in December 1978, the City attorney asserted that all thorium deposits in West Chicago should be removed.

In August 1979 a plan to decommission the Facility and encapsulate ("bury") the thorium on site was contested before the NRC. De-

bate raged for over a decade, with some residents vehemently opposed to the plan, arguing for the complete removal of all thorium.

In October 1979 the *Chicago Tribune* published an article about the City, referring to it as "the radioactive capital of the Midwest." The article described the concerns of City residents that radiation could pose a health threat, as well as defendants' and the NRC's contention that there was no public danger. Press reports throughout the remainder of 1979 documented the City's opposition to defendants' decommission plan.

In 1980, both the State of Illinois and the City filed separate lawsuits in state court against defendants. Both suits received coverage in the local papers. Both suits were removed to federal court and both generated considerable publicity over the next several years. Both suits were ultimately dismissed by the trial court based on federal preemption. On appeal, the Court of Appeals held that the state suit was improperly removed, and that the City suit was prematurely dismissed. *State of Illinois v. Kerr–McGee Chem. Corp.*, 677 F.2d 571 (7th Cir.1982). The state suit was remanded and trial began in 1986.

Local coverage of the situation, and the government's and defendants' attempts to alleviate it, continued throughout 1981 and 1982. In May 1982 the NRC issued a draft Environmental Impact Statement ("EIS"), approving defendants' decommission plan pursuant to which the tailings would be buried on site. The local press published extensive excerpts of the draft EIS and issued notices of public debates which continued throughout the year. During one 1982 NRC public meeting the question of diminished property value was raised by a resident who stated that he could not sell his house because of the Facility. By July, EPA submitted comments to the draft EIS, noting that waste had already been found on numerous locations throughout the City, posing a potential health hazard. By October 1982 the mayor of West Chicago had submitted the first of two petitions to the NRC signed by over 200 residents seeking to force the NRC to require defendants to remove all hazardous chemicals from the City. The following month, between 70 and 150 protestors

marched near the Facility to express opposition to defendants' plan to bury the tailings on the site. The march was reported in the local newspapers as well as the *Chicago Tribune*.

By 1983, the publicity surrounding the thorium problem was so widespread that it became a key primary issue discussed by all candidates for local office. In May 1983 the NRC published a final version of the EIS, approving defendants' decommission plan pursuant to which the tailings would be buried at the Facility. That document indicated that the nearby residents considered the Facility a detriment to the neighborhood because of appearance and possible detraction from property values. The document further noted that an NRC study had found "localized areas of elevated radiation levels" at locations outside the Facility.

On August 22, 1983, the 6:00 p.m. "Eyewitness News" broadcast on WLS TV Chicago featured a story concerning the City. During that broadcast an unidentified resident asserted that publicity concerning radiation had lowered property values in the community. Another person identified as a resident stated that he had difficulty selling his property because of "what has been in the paper, the news."

In 1984 the City and defendants agreed to remove thorium deposits located on residential properties within the City. Those cleanups began in 1984 and continued into 1985. Over 100 properties that had radiation readings exceeding a certain threshold were excavated and described in the news media as "hot spots" and as "hazardous sites." The clean-up project was covered extensively by the press.

On October 15, 1984, the EPA proposed the addition of West Chicago residential properties, Reed–Kepler Park, and Kress Creek to the National Priorities List commonly known as Superfund. By March 1985 the City thorium issue had received national attention in a *New York Times* article entitled, "Battle Over Radioactive Waste Tests U.S. Policy." That article quotes West Chicago Mayor Reynolds as stating "it's our only issue, our obsession, and as much as land and water it has infected the minds of the com-

munity." The article also indicated that residents spoke of the town's high rates of cancer and birth defects and cited a host of maladies such as thyroid problems and low sperm counts.

By June 1987 the NRC published a draft supplement to the EIS concerning proposed decommissioning of the Facility. In September 1987 the City submitted a list of 174 questions raised at a public meeting in response to the NRC's draft supplement to the EIS. Among the issues raised by residents was the fact that the values of their houses were low because of the Facility. Residents asked whether defendants would purchase their homes for its true value. Residents questioned whether anyone would purchase their homes or even move to the City, and Residents questioned whether defendant would be around in 30 years to compensate victims and their families for unknown injuries caused by long-term exposure to radioactive waste. In August 1987, an article entitled "Dream house turned into a hot house," appeared in the *Winfield Examiner*, the local paper. This article described in detail the claims of plaintiff Nicholas Dassion that his house was a health hazard because of the presence of thorium deposits on his property.

In May 1988 the Illinois House voted to approve a bill giving the State the authority to ask the NRC for jurisdiction over the City tailings. The press noted that the tailings had been blamed for health problems and observed that if the State were to obtain regulatory authority it could force defendant to remove the tailings from the City. In August 1988, Governor Thompson went to West Chicago to sign the bill into law in a widely reported ceremony. By the end of 1988 the City press had described the thorium saga as the top news story of 1988.

In April 1989 the NRC published another supplement to the EIS concerning the decommission plan for the Facility. This document indicated that thorium bearing material was present in Kress Creek, the west branch of the DuPage River and the West Chicago treatment plant. The supplement also discussed concerns that the Facility and its waste had caused a diminishment in property values near the Facility site. The document stated that "data also suggests that the nega-tive publicity associated with the Kerr–McGee Facility (and not the presence of the site itself) contributed to the observed effect" on property values. The document further stated, however, that "evaluation of similar circumstances in other parts of the county has not established a long term relationship between proximity to environmental hazardous and residential property values ...."

In 1990, residents formed the Thorium Action Group ("TAG"), a community activist organization with the stated goal of pressuring defendant and political officials to remove the thorium from West Chicago. Beginning in January 1990, TAG members engaged in numerous activities that were designed to and did receive extensive news coverage, including distributing fliers, organizing public demonstrations, holding meetings, collecting approximately 9400 signatures on a petition to the NRC, initiating a letter writing campaign to the NRC, and advertising in the press. In February 1990 an NRC licencing board approved the decommissioning plan. The decision was attacked by City, State and County officials, as well as by leaders of TAG. In April 1990 TAG staged a protest rally at Reed–Kepler Park. There were speeches by Congressman Hassert, State Representative Henslo and Mayor Netzle, and the protestors formed a human chain around the fenced-in waste deposit in the park. In May 1990 the state court issued a preliminary injunction barring defendant from burying tailings at the Facility. The press reported that Attorney General Neil Hartigan was cheered outside the courthouse by West Chicago residents. The protest was covered in an article in the *Chicago Tribune*.

In February 1991, citing an agreement under which Illinois was to regulate the Facility, an NRC licencing board vacated and reversed its decision approving defendants' on-site disposal plan. This action prompted extensive media coverage and a rally outside the Facility. Later in June 1991 the press published a number of articles recounting the history of the thorium controversy and describing beliefs of West Chicago residents that cancer rates were linked to thorium. There was a number of local television news stories about the issue as well.

In addition to the obvious widespread publicity, the thorium problem at the City spawned a number of lawsuits. In October 1981, Robert Westrom sued defendants, seeking damages arising from alleged thorium contamination of a building in the City known as the Bolles Opera House. In that suit, the plaintiffs alleged that they had purchased the building from defendants, and that the building contained levels of radiation that were "unsafe for human exposure." News coverage of the case mentioned "unsafe levels of radiation," and reported that Westrom supposedly had so much radiation in his body that he had a "66% chance of contracting bone cancer."

In September 1982, City resident Donald Brown sued defendants seeking millions of dollars in damages and a court order compelling clean-up of the West Chicago Facility. The complaint alleged that the wastes at the Facility "are hazardous to human health and the organs of the human body." News reports described the suit as seeking a removal of hazardous and radioactive waste from the Facility. In March 1986, Jennifer Falwell sued defendants alleging that her Hodgkin's Disease was caused by the thorium radiation in the City. The case received extensive coverage in the news media. The *Chicago Tribune* reported that Ms. Falwell, niece of U.S. Rep. Harris Falwell, "charged in a lawsuit that she had contracted Hodgkin's Disease ... as a result of radioactive waste being dumped on the land where her parents' home is located." In addition, Jennifer Falwell's parents, Thomas and Sharon Falwell, filed a class action suit against defendants alleging that residential properties in West Chicago were "dangerous and harmful to inhabit and therefore had diminished property values." The lawsuit was dismissed one month later.

In 1989, because West Chicago had passed an ordinance prohibiting defendant from transporting over City streets soils excavated from residential properties in unincorporated areas, defendant and Roy Peterson, a county homeowner, filed suit against the City in federal court. This lawsuit was covered extensively in the press because it divided the West Chicago community. The lawsuit was ultimately settled, which settlement was reported by the news media. Finally, in 1992 Joe Macias filed a class action complaint against defendants and the City alleging, among other things, property damages and a failure to warn of the hazards of the thorium released. In addition, plaintiff Dassion filed a lawsuit in 1982 alleging that the persons who sold him his home fraudulently misrepresented that there were no dangerous and/or radioactive chemicals on the Facility.

## DISCUSSION

As noted, defendants have moved for summary judgment on all of the adult plaintiffs claims, arguing that the claims are barred by the applicable statute of limitations and/or laches. With respect to the allegations relating to property damage or diminution in value, the parties agree that all such claims must be filed within five years from the date that the cause of action accrues. 735 ILCS 5/13–205. Defendants assert that plaintiffs' personal injury claims for medical monitoring relief are governed by a two year statute of limitations period. 735 ILCS 5/13–202. While plaintiffs do not concede that two years is the applicable limitations period, they have suggested no other. Because the medical monitoring claims are based on personal injury, the court agrees that the two year limitation period in § 202 applies.

### Property Damage

Plaintiffs filed the instant action on December 16, 1996. Defendants assert, therefore, that plaintiffs' claims are untimely if they accrued prior to December 16, 1991. Plaintiffs, on the other hand, argue that the *Macias* class action, which was filed in 1992, tolled the running of the limitations period. Because *Macias* was pending for 23 months, plaintiffs assert that the applicable limitations cut-off date is January 12, 1990. While the court agrees that *Macias* tolled the running of the limitations period, as demonstrated below, it really does not matter because plaintiffs' claims for property damage accrued well before January 12, 1990.

In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the Court held that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to

continue as a class action. Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point class members may choose to file their own suits or to intervene as plaintiffs in the pending action. *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 353–54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983).

■ Courts have been reluctant, however, to extend this so-called "piggyback" rule to a second class action. The general rule is that the pendency of a previously filed class action does not toll the limitations period for additional class actions by putative members of the original asserted class. *Griffin v. Singletary,* 17 F.3d 356, 359 (11th Cir.1994); *Andrews v. Orr,* 851 F.2d 146, 149 (6th Cir.1988)(citing *Korwek v. Hunt,* 827 F.2d 874, 879 (2nd Cir.1987)). The reasons for this reluctance is succinctly set out in *Korwek,* 827 F.2d at 879: "the Supreme Court ... certainly did not intend to afford plaintiffs the opportunity to argue and reargue the question of class certification by filing new but repetitive complaints." In *Salazar–Calderon v. Presidio Valley Farmers Ass'n,* 765 F.2d 1334, 1351 (5th Cir.1985), the court stated that "plaintiffs have no authority for their contention that putative class members may piggyback one class action onto another and thus toll the statute of limitations indefinitely ...." Thus, it is clear that once class certification has been denied, the pendency of the previously filed class action does not toll the limitations period for additional class actions.

■ As plaintiffs point out, however, the *Macias* class action was settled and dismissed prior to any determination on class certification. Thus, plaintiffs argue that the reasoning behind the no piggyback class action rule is inapplicable to the instant case. This court agrees that the underlying principle behind the rule would not be furthered by its application in the instant case. The general rule is applied in instances where a decision on the appropriateness of proceeding as a class has been determined, to prevent plaintiffs from "engag[ing] in endless

rounds of litigation over the adequacy or propriety of proceeding as a class." *Griffin,* 17 F.3d at 359. Because the *Macias* court never reached a decision on class certification, the general rule permitting a piggyback class does not apply. Accordingly, the court concludes that the appropriate limitations cut-off date is January 12, 1990.[1]

■ Illinois applies a "discovery rule" to determine when a cause of action accrues and the statute of limitations begins to run. *Nolan v. Johns–Manville Asbestos,* 85 Ill.2d 161, 167, 52 Ill.Dec. 1, 421 N.E.2d 864 (1981). This rules provides that the "limitations period does not begin to run until there exists actual or constructive knowledge of both a physical problem and that someone may be at fault for its existence." *Roper v. Markle,* 59 Ill.App.3d 706, 709, 16 Ill.Dec. 827, 375 N.E.2d 934 (5th Dist.1978). At that time the burden is placed on the injured party to inquire as to the existence of a cause of action. *Sille v. McCann Construction Specialties Company,* 265 Ill.App.3d 1051, 1055, 202 Ill.Dec. 808, 638 N.E.2d 676 (1th Dist. 1994). Thus, the issue before this court is when plaintiffs knew or reasonably should have known that they had been injured by defendants' actions. *Id.* More particularly, the question is whether they knew or reasonably should have known that they had a diminution in their property values prior to January 12, 1990, and that defendants may be at fault.

■ A determination of the point in time that the statute of limitations commences is most often a question of fact for a jury to determine. *Id.* at 1056, 202 Ill.Dec. 808, 638 N.E.2d 676. Where there are undisputed facts from which only one conclusion may be drawn, however, the question is one for the court. *Id.* Neither plaintiff nor defendant has suggested a date at which time they believe the statute began to run. The undisputed facts set forth above, however, lead to the inescapable conclusion that all plaintiffs either knew or reasonably should have

---

1. The Illinois courts have not addressed this issue. The Illinois Supreme Court has indicated agreement with and an intent to follow *American Pipe. Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 13 Ill.Dec. 699, 710, 371 N.E.2d 634 (1977). Accordingly, the court concludes that the Illinois Supreme Court would apply the piggyback rules as applied above.

known about claims for property damage well before January 12, 1990.

██ The Dassion plaintiffs (except for the minor, Rebekah, for whom the statute does not begin to run until she reaches majority) are the most obvious example. In 1982 plaintiff Nicholas Dassion sued the person from whom he brought his property and the seller's real estate agent, alleging that they had concealed that the Facility had processed radioactive material. In responses to interrogatories produced in 1983, the Dassions stated that they had in their possession over 300 pages of articles and reports from the EPA relating to the thorium problem. In 1984 they had their property tested by the EPA for radioactivity. The tests demonstrated the presence of radioactivity. In 1987 Nicholas Dassion told a reporter that his property was contaminated by radioactive material from the Facility. He specifically stated that he was unable to sell his property. In March 1990 (after the limitations date) he called a cable television call-in program and stated that he believed there was a health hazard in the City and that he had laboratory results showing elevated levels of thorium and uranium on his property.

In his affidavit, Dassion states that he has never "known" that his property was contaminated prior to April 1997 when he received a notice to that effect from the EPA. He further states that every time he inquired of the EPA or defendants about health risks and risks to his property value caused by the thorium, he was assured that "all the experts" had concluded that the contamination posed no damage to health or property values whatsoever. He further states that up until 1995–96, when defendants began to clean his neighbors' properties, he believed defendants' 1985 clean-up had cleared all residential property of contaminants.

In light of the extensive media coverage surrounding the controversy, and plaintiff Dassion's admitted statements, the court finds the affidavit unpersuasive with respect to the property damage claim. The question is not what plaintiffs actually knew or even could have known, but what they reasonably should have known. In the Dassions' case, Nicholas stated as early as 1987 that he could not sell his house. He attributed that inability directly to the thorium problem, which he knew or should have known was caused by defendants. He stated this even though his property was not one "cleaned" by defendants in 1985. The fact that in 1985 his property did not exhibit readings over the threshold level for the 1984 clean-up in no way establishes that the property was clean or that the value of the property was not diminished as a result of the entire situation. Indeed, paragraph 80 of the amended complaint alleges that even those residential properties not physically contaminated with radioactive thorium waste are treated differently than comparable uncontaminated property because of their location within one of the Superfund sites or near other residential properties that are in fact physically contaminated. Paragraph 80 further alleges that residential properties not physically contaminated have suffered injury in the form of loss of market value. Additionally, as early as 1983 residents were claiming that property values had diminished as a result of the publicity surrounding the thorium problem.

The discovery rule does not allow a plaintiff to wait until the defendant admits it has caused plaintiff's damage. That would be a very long wait indeed. The rule places the burden on plaintiffs to inquire as to the existence of a cause of action. Nor could plaintiffs in the instant case reasonably rely on "experts'" statements that the level of thorium posed no danger to their property values. Plaintiffs, and in particular Nicholas Dassion, had direct evidence otherwise. Dassion knew he could not sell his house because of the thorium. At that point the statute began to run unless inquiry determined that he did not have a cause of action. That does not mean that he did not yet have definitive proof, only that he had been injured and the injury was caused by defendants. Plaintiffs cannot sit idly by and wait for the defendants to admit their liability or even for the federal government to prove their claims. They must do that themselves. *See,* e.g., *Weger v. Shell Oil Co.,* 966 F.2d 216, 219 (7th Cir.1992)(a claimant's unconfirmed belief that exposure to defendant's chemical causes illness triggered the limitations period, even though the causal connection between chemical exposure and renal failure was still debated). The Court thus

concludes that the Dassions had actual knowledge of their property damage claim prior to January 12, 1990. There is far less evidence that the Carey and Bozidurevic plaintiffs had actual knowledge prior to January 12, 1990. Nevertheless, the "obsession" of the West Chicago community with the thorium tailings problem, and the pervasive media coverage and publicity surrounding the issue, beginning in 1976 and continuing into 1991, leads the court to the inescapable conclusion that a reasonable person in their situation should have known of their claim.

In the instant case, the undisputed evidence clearly demonstrates that the residents of the City knew or reasonably should have known prior to January 12, 1990, that their property values had been damaged as a result of the thorium tailings problem directly caused by the Facility. A reasonable person in plaintiffs' position could not have avoided knowing of the presence of the thorium tailings and of its potential and actual harm to their property values. Indeed, although short lived, the *Thomas Falwell* class action in 1982 alleged diminished property values. Accordingly, the property damage claims in Counts III, IV and V are dismissed as untimely.

■ Counts I and II, however, allege the continuing torts of trespass and nuisance. When a tort involves a continuing or repeated injury, the statute of limitations does not begin to run until the date of the last injury or when the tortious act ceases. *Hyon Waste Management Services, Inc. v. City of Chicago*, 214 Ill.App.3d 757, 762, 158 Ill.Dec. 335, 574 N.E.2d 129 (1st Dist.1991). A continuing violation, however, is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation. *Id.* The focus is on whether the defendants' conduct continues, not whether the effects continue. Counts I and II incorporate by reference all the previous factual allegations, and then allege that defendants have committed trespass and nuisance by "depositing radioactive thorium on their properties without the Owners' permission or invitation. This trespass is ongoing and continuous." Neither count is specific as to whether the depositing of the thorium continues, or simply that the thorium remains deposited.

In their briefs, plaintiffs argue that defendants had a huge uncovered pile of thorium tailings (referred to by residents as "Mt. Thorium") on its property as late as 1995, and that the wind continued to deposit tailings onto residential properties up until that date. The allegations of the amended complaint, however, are not so specific. Paragraph 37 indicates that between 1930 through 1950 residents hauled off contaminated tailings for use as landfill, and paragraph 39 makes reference to "Mt. Thorium" but does not indicate when it existed or when the winds blew thorium from it, except to state in a footnote that in 1995 the NRC found the tailings cover to be in disrepair.

Such allegations are insufficient to support a claim of continuing trespass or nuisance. It appears, however, that the plaintiffs may be able to properly plead a claim for continuing tort, at least up to 1995. Accordingly, the court grants plaintiff leave to file an amended complaint with respect to Counts I and II only, mindful of their obligations under Fed.R.Civ.P. 11, alleging continuing trespass or nuisance.

### Medical Monitoring

In their request for relief plaintiffs seek certification of a "medical monitoring class" and an order creating a court supervised fund to pay for medical monitoring for the class. Defendants have moved first to dismiss the medical monitoring claim for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), and in the event the court denies that motion, for summary judgment against the adult plaintiffs based again on expiration of the statute of limitations.

In their motion to dismiss, defendants characterize plaintiffs' complaint as seeking damages for alleged future injuries without any claim of present injury or that the future injury is "reasonably certain" to occur. Citing *Morrissy v. Eli Lilly and Co.*, 76 Ill. App.3d 753, 32 Ill.Dec. 30, 394 N.E.2d 1369 (1st Dist.1979), defendants argue that Illinois law does not provide a remedy for claimants who have not suffered a present compensable injury. In *Morrissy*, plaintiffs brought a putative class action on behalf of women whose mothers had ingested a drug known as DES during pregnancy. As a result, daugh-

ters born to those mothers allegedly had an increased risk of contracting cancer and other diseases. The plaintiffs sought a court administered fund to provide class members with medical monitoring for the rest of their lives. In an effort to establish the propriety of a class action, the plaintiff had argued that the principle remedy sought was equitable in nature and resulted from exposure to DES rather than the present occurrence of a specific injury. The Illinois Appellate Court noted that the plaintiff did not seek "personal injury damages in the traditional sense, but rather compensation for the heightened risk of contracting one or more named diseases as a consequence of DES exposure." *Id.* at 759, 32 Ill.Dec. 30, 394 N.E.2d 1369. The court went on to state:

> Plaintiff here ... is essentially alleging the existence of latent disease as a present injury to herself and the proposed classes. The nexus thus suggested between exposure to DES in utero and the possibility of developing cancer or other injurious conditions in the future is an insufficient basis on which to recognize a present injury. In Illinois, possible future damages in a personal injury action are not compensable unless reasonably certain to occur.

*Id.* at 761, 32 Ill.Dec. 30, 394 N.E.2d 1369.

Relying on *Morrissy,* the court in *Wehmeier v. UNR Industries, Inc.,* 213 Ill.App.3d 6, 157 Ill.Dec. 251, 572 N.E.2d 320 (4th Dist. 1991), held that it was reversible error to admit evidence of the plaintiff's increased risk of cancer due to his exposure to asbestos. The court concluded that the plaintiff had not established that it was a reasonable medical probability that he would contract cancer, and that damages could not be awarded on the basis of conjecture or speculation and must be proved to be the proximate result of the complained of wrong. *Id.* at 34, 157 Ill.Dec. 251, 572 N.E.2d 320.

Defendants, relying principally on the reasoning of *Morrissy* and *Wehmeier,* argue that under Illinois law, plaintiffs must plead either that they have already suffered a physical injury, or there is a reasonable medical certainty that they will contract any of the specified diseases. They have done neither.

In response, plaintiffs argue that defendants have mischaracterized their claim as one for an "increased risk" of contracting disease which requires proof of a "reasonable certainty," when they have actually alleged a claim for medical monitoring, which has no such requirement because it does not seek future damages. Plaintiffs recognize that no Illinois court has as yet accepted such a claim in the absence of any present physical injury, but argue that the modern trend is to accept such claims and that states that have recently examined the issue have allowed medical monitoring claims on public policy grounds.

The difference between a claim for an increased or enhanced risk and one for the reasonable costs of medical monitoring or surveillance is best described in *In re Paoli Railroad Yard PCB Litigation,* 916 F.2d 829, 850 (3rd Cir.1990), in which the court instructed that:

> An action for medical monitoring seeks to recover only qualified costs of periodic medical examinations necessary to detect the onset of physical harm, whereas an enhanced risk claim seeks compensation for the anticipated harm itself, proportionately reduced to reflect the chance that it will not occur. We think that this distinction is particularly important because the Pennsylvania Supreme Court has expressed some reluctance to recognize claims for enhanced risk of harm. In *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 494 A.2d 1088 (1985), the Court made clear that a plaintiff in an at-risk suit must prove that the future consequences of an injury are reasonably probable, not just possible. *Martin* does not lead us to believe that Pennsylvania would not recognize a claim for medical monitoring, however. First, the injury that the Court was worried about finding with reasonable probability in *Martin* is different from the injury involved here. The injury in an enhanced risk claim · is the anticipated harm itself. The injury in a medical monitoring claim is the cost of the medical monitoring that will, one hopes, detect that injury. The former is inherently speculative because courts are forced to anticipate the probability of a future injury. The latter is much less speculative because the issue for the jury is the less conjectural question of whether the plaintiff needs

medical surveillance. Second, the Pennsylvania Supreme Court's concerns about the degree of certainty required can easily be accommodated by requiring that a jury be able reasonably to determine that medical monitoring is probably, not just possibly, necessary. (Citations omitted).

The *Paoli* court noted that *Morrissy* had disallowed a medical monitoring theory but distinguished the case because the plaintiff in *Morrissy* sought a fund for treatment for future injuries as well as monitoring, while the plaintiffs in the case before it sought only monitoring damages. Thus, the *Morrissy* court's holding that "the nexus thus suggested between exposure to DES in utero and the possibility of developing cancer or other injurious conditions in the future is an insufficient basis on which to recognize personal injury" was inapposite. *Paoli* went on to conclude that the future expense of medical monitoring could be a recoverable consequential damage provided that plaintiff could establish with a reasonable degree of medical certainty that such expenditures are "reasonably anticipated" to be incurred by reason of exposure. Thus, the appropriate inquiry is not whether it is reasonably probable that plaintiffs will suffer harm in the future, but whether medical monitoring is, to a reasonable degree of medical certainty, necessary in order to diagnosis properly the warning signs of disease. *Id.* at 851.

As noted, no Illinois court has ruled directly on this issue. In *Betts v. Manville Personal Injury Settlement Trust*, 225 Ill.App.3d 882, 167 Ill.Dec. 1063, 588 N.E.2d 1193 (4th Dist.1992), the plaintiffs had all suffered exposure to asbestos and developed some form of asbestos related disease. At trial they were allowed to introduce evidence of an increased risk of cancer despite the fact that no doctor had testified that persons suffering from asbestos were more likely than not to contract cancer because of their exposure. On appeal, the court distinguished *Wehmeier*, concluding that the evidence was admissible to demonstrate the need for future monitoring and to recover the expense therefor, but would not allow reference to the word "cancer" because of its highly inflammatory nature, unless the defendant elected to challenge the need for monitoring as opposed to the cost involved. *Betts* thus accepted the

concept of medical monitoring for the possibility of contracting future injury, at least in situations where the plaintiffs had already suffered some present injury due to exposure.

■ In adjudicating state law claims, this court is to decide the case as it believes the Illinois Supreme Court would decide it. *Birchler v. Gehl Co.*, 88 F.3d 518, 521 (7th Cir.1996). In *Birchler*, the Seventh Circuit instructed that when faced with opposing plausible interpretations of state law, federal courts should generally chose the narrower interpretation that restricts liability, rather than the more expansive interpretation that creates more liability. *Id.* It further stated that "our policy will continue to be one that requires plaintiffs desirous of succeeding on novel state law claims to present those claims initially in state court." *Id.*

Defendants cite *Birchler* to this court, arguing that whether Illinois should adopt a claim for medical monitoring is an issue that should be brought initially to the state court. In the instant case, however, that is precisely what plaintiffs attempted to do. They filed their suit in state court, and it was defendants who removed it to this court. It is disingenuous that, having elected to proceed here, defendants now argue that this court should not reach the issue.

■ This court concludes that if faced with the precise issue now before the court, the Illinois Supreme Court would uphold a claim for medical monitoring without requiring plaintiffs to plead and prove either a present physical injury or a reasonable certainty of contracting a disease in the future. As noted in *Paoli*, 916 F.2d at 852, the policy reasons for recognizing this cause of action are obvious.

"Medical monitoring claims acknowledge that, in a toxic age, significant harm can be done to an individual by a tortfeasor, not withstanding latent manifestation of that harm. Moreover, as we have explained, recognizing this tort does not require courts to speculate about the probability of future injury. It merely requires courts to ascertain the probability that the far less costly remedy of medical supervision is

**1120**

appropriate. Allowing plaintiffs to recover the cost of this care deters irresponsible discharge of toxic chemicals by defendants and encourages plaintiffs to detect and treat their injuries as soon as possible. These are conventional goals of the tort system as it has long existed in Pennsylvania."

That policy is certainly equally valid in Illinois. Recognizing the very real present need for medical monitoring, should expert testimony establish that such expenditures are necessary "to a reasonable degree of medical certainty," is totally consistent with and in no way compromises the Illinois courts' refusal to award damages for future injuries that cannot be established to such a degree of medical certainty. Accordingly, this court concludes that plaintiffs have stated a claim for medical monitoring, and denies defendants' motion to dismiss.

■ The court's conclusion is but a Pyrrhic victory for the adult plaintiffs, however, because their claim is barred by the applicable statute of limitations. Having concluded that they state a claim for medical monitoring, that claim, which is a form of personal injury, is covered by Illinois' two year limitations period. 735 ILCS 5/13–202 (1995). As noted above, the adult plaintiffs either knew or should reasonably have known of the thorium tailings and any potential health hazards well before two years prior to the date the present suit was filed. Indeed, the *Macias* class action included claims for medical monitoring. That lawsuit was dismissed on March 17, 1994, over two and one-half years before the instant action was filed. Accordingly, the medical monitoring claims of the adult plaintiffs [2] are barred by the statute of limitations, and summary judgment is granted to defendant.

### *Conclusion*

For the reasons set forth above, the defendants' motion for summary judgment is denied as to Counts I and II, and granted as to the property damage and personal injury claims of the adult plaintiffs in Counts III, IV and V. Defendants motion to dismiss the personal injury claims in Counts III, IV and V is denied. Plaintiffs are granted leave to file an amended complaint consistent with this opinion on or before April 17, 1998. Defendants shall file a responsive pleading on or before May 1, 1998. This matter is set for a report on status on May 5, 1998.

---

**2.** This ruling does not affect the claim of the minor plaintiff Rebekah Dassion.